**UNITED STATES of America**

v.

**Lawrence DEMANGONE, Appellant.**

No. 71–1658.

United States Court of Appeals,
Third Circuit.

Argued Nov. 19, 1971.

Decided March 3, 1972.

See also D.C., 322 F.Supp. 989.

Allan H. Cohen, Gatz, Cohen & O'Brien, and Michael P. Malakoff, Pittsburgh, Pa. (Berger & Kapetan, Pittsburgh, Pa., Patrick Mahady, Greensburg, Pa., on the brief), for appellant.

Kathleen Kelly Curtin, Asst. U. S. Atty., Pittsburgh, Pa. (Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, ADAMS and MAX ROSENN, Circuit Judges.

OPINION OF THE COURT

BIGGS, Circuit Judge.

The defendant appellant Demangone was indicted for failure to keep his classification notice in his possession. The Grand Jury charged: "That on or about the 15th day of April, 1970, at Pitts-

burgh, in the County of Allegheny, in the Western District of Pennsylvania, the defendant, Lawrence Demangone, being, in pursuance of the Military Selective Service Act of 1967, a registrant with Local Board No. 167 at Greensburg, Pennsylvania, unlawfully, wilfully and knowingly did fail and neglect to perform a duty required of him by the said Act and the rules, regulations and directions issued pursuant thereto, in that the defendant did fail and neglect to keep and retain in his possession his Classification Notice, Selective Service System Form No. 110. In violation of Title 50, Appendix, United States Code, Section 462(a)." [1]

I

At a peace rally held in Point Park by Monsignor Rice on April 15, 1970, Wyndle Watson, a reporter of the Pittsburgh Press, stated: "Monsignor Rice was on the stand at the time, and the best I can recall he said he had somebody to introduce, and I believe he said something to the effect that 'many of you know him, have met him before,' or something to that effect, and introduced a young boy. I believe he called him Larry, or called him Lawrence Demangone, and he took the microphone at that time and indicated that this was the second draft card that he had given up. He said, 'They sent me another one, and I have no further use for it,' and he turned over what he identified as his draft card to Monsignor Rice."

The following questions and answers follow in the transcript, the questions being asked by Assistant United States Attorney Kathleen Curtin:

"Q. Would you proceed?

A. . . . [H]e identified himself as Lawrence Demangone.

Q. He identified himself as Lawrence Demangone?

A. He was introduced—sorry—as Lawrence Demangone. I am not sure, but I might have talked to him later.

I am not positive. I got the spelling of his name somewhere. I would assume that in normal procedure I would have talked to him when he stepped down from the stage to get the proper spelling of his name and where he was from.

Q. Do you recall what he said at the time?

A. . . . I don't have the clipping. I am sure I quoted him to the effect that they sent him another draft card and he still didn't have any need for one, something to this effect, and he turned it over to Monsignor Rice. I didn't see the card. The card wasn't destroyed in my presence.

Q. Did he at that time make any other reference to any other persons?

A. He mentioned about being in Federal Court with another person previously. I think he referred to it as 'a year ago.'

Q. Did he at that time identify this as his draft card?

A. Yes.

Q. How far away were you standing from this person?

A. Ten, fifteen feet, I would say.

Q. What did he do with his draft card?

A. He turned it over to Monsignor Rice.

Q. Did Monsignor Rice accept it?

A. Yes.

Q. Can you identify the person?

A. I have seen this young man here, but I could not sit here and say from an appearance a year ago it was him, and there were a lot of people there. No, I wouldn't say this is definitely the man.

Q. However, you were present when he was introduced as Lawrence Demangone?

A. Yes.

1. A previous appeal by Demangone was before this court at 419 F.2d (1969, rehearing denied 1970).

\* \* \* \* \* \*

By the Court:

Q. What did you see turned over to Monsignor Rice?

A. It was a card that was the right size for a draft card, but it was identified as his draft card. I didn't get a close look at it." [2]

At a later point Watson testified as follows, the questions again being asked by Mrs. Curtin:

Q. Mr. Watson, I have here the Pittsburgh Press dated Thursday, April 16, 1970. I refer you to page 2 and ask whether or not you wrote the article concerning 'Life Gets Priority in March Hearing'?

A. Yes, it has my name.

Q. Do you recall writing that article?

A. Yes.

Q. Using that then to refresh your recollection, would you glance at that article and tell us whether or not you can recall the exact words used by Lawrence Demangone in the part when you saw him turn in what he purported to be his classification card.

A. Yes.

\* \* \* \* \* \*

Q. Mr. Watson, if you have reviewed that article, could you tell us whether or not you can recall the exact words used by Mr. Demangone?

A. I have a quote here, which thing I am very careful of. If I don't have the exact words, I will paraphrase without quoting, but I have Lawrence Demangone as saying 'About a year and a half ago David Worstel and myself appeared in Federal Court for the first time. I recently got this new draft card, and I still have no use for it.' After showing the draft card, he turned to Monsignor Rice at that time—." [3]

On June 11, 1970 Demangone made certain admissions to FBI Agent Hendon which amounted in substance to a confession. There is no substantial issue as to the voluntariness of these admissions. Agent Hendon testified, again the questioning being by Mrs. Curtin:

"Q. Will you tell us after this [Miranda warning] form had been signed what took place?

A. I . . . explained that I wanted to talk to Mr. Demangone regarding possible selective service violations, and told Mr. Demangone I wanted to talk to him without the presence of his counsel, and that his counsel could wait outside the room, and that if he wanted to confer with counsel at any time during the interview, he was perfectly free to do so, and that he was not under arrest, and he could leave at any time he wanted to. Then I began the interview.

Q. All right. Would you proceed with the interview?

A. Yes. May I refer to my notes?

Q. Yes.

A. I asked Mr. Demangone where he was registered with the selective service system, and he told me he was registered with the system at Local Board 167 in Greensburg. He said that on April 15, 1970 at a peace rally at Point Park in Pittsburgh, Pennsylvania, that he turned in his selective service classification card which classified him 1–A, turned it over to Monsignor Charles Owen Rice.

He said that he telephonically contacted Monsignor Rice approximately two days before the 15th and asked Monsignor Rice if Monsignor Rice would take the card, and Monsignor Rice said he would.

At that time Mr. Demangone was asked if he had in his possession a selective service card, and he said he did not have such a card. He said he turned in his selective classification card to Monsignor Rice on April 15, 1970.

---

2. Transcript at 80–82.

3. Transcript at 100–101.

810

He further said that he was ordered to report by Local Board 167 of Greensburg, Pennsylvania, for induction into the military service on April 19, 1970. Mr. Demangone said that he proceeded to Local Board 167 in Greensburg, Pennsylvania, on that date, but did not proceed from Greensburg to Pittsburgh for induction.

The Court: What is the date on that report?

A. April 19, 1970. He said he went to the local board on that date, but did not proceed from Greensburg to Pittsburgh for induction.

By Mrs. Curtin:

Q. Did he explain to you why?

A. He said that the failing to report for induction in Pittsburgh and turning in his selective service classification card were both symbols of his protest against the war in South East Asia.

Q. Was there anything further?

A. Nothing that I can recall." [4]

■ The most important issue raised by Demangone is, is there sufficient independent evidence to corroborate Demangone's confession and to prove the *corpus delicti*. See Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L. Ed. 101 (1954) and Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192. See also Wright, Federal Practice and Procedure, Criminal § 414 at 165 et seq. It is clear that the evidence given by Watson was hearsay insofar as it relates to the identification of the individual who passed a card about the size of a draft card to Monsignor Rice. There is no physical description of Demangone in the record and therefore no basis of comparison as to size or other details of his appearance so that some basis of comparison could be had with the individual who gave a card to the priest. Nor is there any physical description given by Watson as to the person who did pass a card to Rice. Nonetheless, in the absence of proof of an elaborate, deliberately conceived Machiavellian plot and in the light of the fact that the acts which took place admittedly at Point Park do remarkably match Demangone's confession, we are constrained to hold that there is proof that Demangone did turn his card over to the priest at the peace rally; or at the least, the conclusion of the trial Judge that there was sufficient corroboration both of the confession and the proof of the *corpus delicti* is not clearly erroneous. Rule 52(b), Fed.R.Crim.Proc., 18 U.S.C. Demangone did not produce his card at the trial but we should also point out that there was no identification by Watson.

II

■ A. Demangone also contends that his failure to carry his Notice of Classification (SSS Form 110) is not a crime. Section 1623.5, 32 CFR requires that a registrant keep in his "personal possession at all times" his Notice of Classification issued to show his current classification. His failure to comply with this regulation is a crime under 50 U.S. C. App. § 462. The requirement for possession is one which, as indicated in Zigmond v. Selective Service Local Board No. 16, 396 F.2d 290 (1st Cir. 1968) punishes wilful noncompliance. We have concluded as did the District Judge that Demangone publicly transferred possession of his SSS Form 110 contrary to the requirement of "personal possession at all times." See United States v. Couming, 445 F.2d 555 (1st Cir. 1971). We adopt the view expressed by the First Circuit.

■ B. Demangone insists that he cannot be prosecuted under Section 12 (a) of the Military Selective Service Act, 50 U.S.C. App. § 462(a), for failure to have his SSS Form 110 in his personal possession at all times. The thrust of his argument is that since Section 12(b) (6), 50 U.S.C. App. § 462(b) (6) speaks directly to knowing violations of a regulation involving possession, that Section

4. Transcript at 87–89.

12(a) which covers failure to comply with Selective Service regulations generally is superseded by the more specific Section 12(b) (6).

A registrant's non-possession of SSS Form 110 is clearly a crime under the wording of either Section 12(a) or Section 12(b) (6). In United States v. O'Brien, 391 U.S. 367, 380, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) the Court spoke on the issue of alternative statutory avenues of prosecution, holding that Congress can properly employ such alternatives, if the alternatives are not used concurrently creating multiple punishment. The Government has chosen to prosecute Demangone only under Section 12(a). Since violation of 32 CFR § 1623.5 is a crime under Section 12(a), we see no reason why that approach may not be used while ignoring an alternative route under Section 12(b) (6), regardless of the latter's greater specificity.

C. Demangone contends that since he was improperly classified as 1–A, United States v. Demangone, 419 F.2d 762 (3 Cir. 1969), he was not required to have in his possession a Notice of Classification (SSS Form 110) "showing his current classification." Demangone's argument is a semantical one. He seems to take the position that the phrase "*valid* Notice of Classification" (emphasis added), should be read as "a Notice of *valid* Classification." All that is meant by 32 CFR § 1623.5 is that the registrant shall have in his possession a certificate that is authentically issued and properly executed by the local board.

D. Two other points raised by Demangone, *viz.*, that the Act could not authorize the enacting of Regulation 1623.5 and that the "Liberty Clause" of the Fifth Amendment protected Demangone from the requirement of having in his personal possession the Notice of Classification, were not raised in the District Court. But in any event they are without merit.

The judgment of conviction will be affirmed.