**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Jeffrey Stuart FALK, Defendant-Appellant.**

**No. 71–1213.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1972.

Decided Oct. 18, 1972.

Rehearing Granted Dec. 14, 1972.

**1102**

William J. Stevens, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gordon B. Nash, Jr., Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, CUMMINGS and SPRECHER, Circuit Judges.

CUMMINGS, Circuit Judge.

In October 1970, a 4-count indictment was returned against the defendant. In

the first count, he was charged with refusing to submit to induction into the Armed Forces. The second count charged him with failure to possess his registration card, and the next two counts charged him with failure to possess his 1968 and 1969 I–A classification cards, respectively. The conduct charged in each count was recited to be violative of 50 U.S.C. App. § 462. A pretrial motion to dismiss the card counts of the indictment on various grounds was denied without holding an evidentiary hearing requested to show an improper prosecutorial purpose in seeking the indictment. A jury found defendant guilty on all four counts, but the district court acquitted him on Count I on the ground that there had been no basis in fact for denying him classification as a conscientious objector.[1] Defendant's motion for a judgment of acquittal on the card counts was denied. He was given consecutive 1-year sentences on these remaining three counts.

As to the registration card which was the subject of Count II, defendant mailed it to then Attorney General Ramsey Clark in December 1967 as a protest measure. He mailed his 1968 classification card, which was the subject of Count III, to a federal district judge in November 1968. Shortly after he received it in May 1969, he mailed his 1969 classification card, which was the subject of Count IV, to his local board. However, he retained in his possession and produced at trial an earlier I–A classification card dated May 5, 1967.

A month after his indictment, defendant appeared at the Selective Service office at 1819 West Pershing Road, Chicago, and requested duplicate draft cards, stating that he had turned in his cards to "proper authorities." Duplicates were not sent to him.

Defendant took the stand and testified that during the previous 18 months he had been a draft counselor in the office of the Chicago Area Draft Resisters. When he turned in his registration card, the United States Attorney in Chicago so advised the Illinois headquarters of the Selective Service System on May 21, 1968. Thereafter, he was sent a delinquency notice and an expedited induction order, but that induction order was cancelled, apparently pursuant to Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532. After he refused to submit to induction on May 14, 1970, the Selective Service System recommended his prosecution therefor.

During the presentation of defendant's case, defense counsel called the Government prosecutor as a witness, but the court sustained an objection to this tack. Subsequently the court allowed defense counsel to call the prosecutor as a witness on an offer of proof. The prosecutor then stated that he neither drafted the indictment nor presented it to the grand jury but was one of those involved in the decision-making as to whether or not to prosecute defendant. Defense counsel was then permitted to state what he expected to prove through the prosecutor's testimony. Thereupon he made an offer of proof that this Assistant United States Attorney was aware of defendant's activities as a draft counselor; that he thought the Government would not be able to prove unlawful counseling or evasion of the draft against defendant but "a good deal of their trouble in enforcing the Selective Service law had been coming from people like him"; that he considered it sometimes unusual to bring an indictment for non-possession of draft cards; that few such indictments were brought; that defendant's draft-counseling activity was one of the reasons why the prosecution for non-possession of draft cards was brought; that he was not sure of the strength of the Government's case on Count I; and that the Government

---

1. See Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308; United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733; United States ex rel. Hemes v. McNulty, 432 F.2d 1182 (7th Cir. 1970); United States v. Lemmens, 430 F.2d 619 (7th Cir. 1970).

would not seek to dismiss the remaining counts even should defendant agree to carry the cards.[2] After the offer of proof was rejected, the prosecutor testified that defendant's file was in the office of the United States Attorney and the indictment was already drafted before the prosecutor joined the government staff. He explained that the indictment was presented to the grand jury by another Assistant United States Attorney. He concluded:

"It [the indictment] was approved by the Chief of our [Northern District of Illinois] Criminal Division, the First Assistant [United States Attorney], the United States Attorney and the Department of Justice in Washington. I had very little to say about the actual *decision of whether or not to prosecute.*"

 Defendant first argues that he was entitled to acquittal on Counts III and IV, dealing with non-possession of his 1968 and 1969 classification cards, on the ground that he possessed a 1967 classification card. These counts charged defendant with willfully and knowingly failing and neglecting to perform a duty required of him under the regulations promulgated under the Military Selective Service Act of 1967, in violation of 50 U.S.C. App. § 462(a).

32 CFR § 1623.5 provides:

"Every person who has been classified by a local board must have in his personal possession at all times, in addition to his Registration Certificate (SSS Form No. 2), a valid Notice of Classification (SSS Form No. 110) issued to him showing his *current* classification, and upon entering active service in the armed forces, such person must surrender such Notice of Classification (SSS Form No. 110) to his commanding officer who shall dispose of it in accordance with the current orders of his service." (Emphasis supplied.)

In May 1967, defendant received a I–A *classification card which he produced at* the trial. Defendant contends that by possessing that card from May 1967 onward he complied with the regulation; since his classification I–A never changed, he argues he always had a card showing his current classification. However, the classification cards defendant was issued, more formally denominated SSS Forms 110 Notice of Classification, have an instruction portion explicitly providing "When a subsequent Notice of Classification is received, you should destroy the one previously received, retaining only the latest." Another Selective Service regulation charged registrants "with the duty of promptly and completely complying with such instruction or requirement." 32 CFR § 1606.51(a).[3] It follows that defendant was required to retain his most recent classification card.[4] And sensibly harmonizing the regulations, when the defendant dispossessed himself of his

2. The basis for defense counsel's offer of proof was said to be a conversation between him and the prosecutor at the latter's office on December 8, 1970.

3. Because of this Section and the instruction on the classification card, defendant is simply wrong in stating that the regulations do not require registrants to retain their most recent classification cards, even accepting (which we do not) the meaning he ascribes to "current" in 32 CFR § 1623.5.

4. Although defendant contends that he was prohibited by 50 U.S.C.App. § 462 (b)(3) from destroying any previous classification cards, retaining only the latest, that Section was surely intended to prohibit the knowing destruction of current certificates (as we have construed the term) prescribed by the Act or regulations and not to cover obsolete documents such as earlier classification cards. There is no showing that defendant had another understanding of the Act. Certainly this provision was not meant to prevent the making of appropriate rules and regulations (pursuant to 50 U.S.C. App. § 460(b) governing the keeping of current certificates and destroying superseded ones. In any event, defendant's argument that he was prohibited from destroying his earlier classification card does not in any way detract from his obligation to retain the most recently issued card.

1968 and 1969 classification cards, those were the cards "showing his current classification" within the meaning of 32 CFR § 1623.5 and thus the ones he was required to "have in his personal possession at all times." This construction is the only one that fully effectuates the purposes of the card possession requirement. For instance, one purpose is the facilitation of answering registrant's inquiries concerning his eligibility status at any given time and another is the promotion of just and efficient administration of the system in the event of a mix-up or mistake in a registrant's Selective Service file. United States v. O'Brien, 391 U.S. 367, 379, 88 S.Ct. 1673, 20 L.Ed.2d 672. Unless the registrant's card reflects the most recent action of the Selective Service System, these purposes may not be fulfilled even if the registrant's classification has not been changed. Issuance of new notices of classification are not issued *pro forma* at regular intervals in the ordinary course of administering the Selective Service System. See 32 CFR §§ 1625.-1–1625.14. Each issuance has independent significance. In this regard it is noteworthy that the 1968 and 1969 classification cards were issued to defendant following appeal board decisions retaining him in I–A classification. Because the possession of the 1967 classification card did not satisfy the regulations, defendant's conviction on Counts III and IV was proper even though he had retained that card.

Defendant next asserts that he was not required to possess the I–A classification cards because (as the district court held) he should have been classified I–O as a conscientious objector and was not validly classified I–A. Since there was no basis in fact for denying him a I–O classification, he submits issuance of a I–A classification card was beyond the board's jurisdiction. In Estep v. United States, 327 U.S. 114, 66 S. Ct. 423, 90 L.Ed. 567, on which defendant relies, the Supreme Court only held that in a selective service prosecution for induction refusal, the defendant may interpose the defense that the action of his local board in rejecting his claim of exemption as a minister of religion and classifying him as I–A was without basis in fact and therefore beyond its jurisdiction. That decision is of no significance here. The Court did not rule that a local board is powerless to mail out classification notices reflecting its action. Much less did it imply that the susceptibility of the substantive classification to attack in a criminal prosecution for refusing induction had any bearing on the registrant's duty to possess the cards issued to facilitate administration of the Selective Service System.

The two notices of classification in question precisely reflect what the local board did, namely, classify the defendant as I–A. This kind of card is "a legitimate and substantial administrative aid in the functioning of this [registration] system * * * [and] serves a legitimate and substantial purpose in the system's administration." United States v. O'Brien, 391 U.S. 367, 378–379, 88 S. Ct. 1673, 1679, 20 L.Ed.2d 672. There the Court pointed out several purposes behind the requirement that registrants keep their notices of classification intact, and these perforce underlie the non-possession regulation. See 391 U.S. at 380–381, 88 S.Ct. 1673. Thus, as already noted, the classification card shows the eligibility classification given to the registrant and makes it easy for him to dispel any question about his possible delinquency while relieving the Selective Service System of the administrative burden that would otherwise exist in verifying the registration and classification of suspected delinquents. It conveniently contains the address of the local board and the registrant's Selective Service number, and, together with its other relevant data, facilitates communication between him and his local board. It simplifies the task of answering the registrant's questions concerning his current eligibility status and operates in the interest of just and efficient administration where, for instance, a mix-up in the registrant's file (or its

unlawful destruction) occurs. It advises him of his appeal rights. Furthermore, the card reminds him to notify his local board of any change of address and status. As the district court held in its unpublished memorandum opinion, "These purposes [of classification cards] are separate from any functions the certificate serves of notifying the registrant of his classification, and are not dependent upon the validity of the classification noted thereon."

The same argument that defendant advances was recently rejected in United States v. Demangone, 456 F.2d 807, 811 (3d Cir.), cert. den., 407 U.S. 914, 92 S. Ct. 2435, 32 L.Ed.2d 689 (1972). As Judge Biggs pointed out:

"Demangone contends that since he was improperly classified as 1–A, United States v. Demangone, 419 F.2d 762 (3 Cir. 1969), he was not required to have in his possession a Notice of Classification (SSS Form 110) 'showing his current classification.' Demangone's argument is a semantical one. He seems to take the position that the phrase 'valid Notice of Classification' (emphasis added), should be read as 'a Notice of valid Classification.' All that is meant by 32 CFR § 623.5 is that the registrant shall have in his possession a certificate that is authentically issued and properly executed by the local board." [5]

Although the district court subsequently set aside defendant's I–A classification, that did not detract from the information accurately represented on these classification cards at the times they were issued. Since the classification cards were valid notices then, it is immaterial that the classifications were

later held to be improper. To the extent that United States v. Hertlein, 143 F. Supp. 742, 746 (E.D.Wis.1956),[6] intimates anything to the contrary, we decline to follow it and instead adopt the position taken in Demangone.

In his motion to dismiss Counts II, III, and IV of the indictment, defendant asserted that on information and belief over 25,000 Selective Service registrants had dispossessed themselves of their draft cards, but he and not they had been indicted. He further alleged that his indictment was "brought not to enforce the Selective Service law but for the unconstitutional purpose of punishing the Defendant for expressing his beliefs that the draft is wrong, that war is wrong, and for lawfully participating in an organization known as the 'Chicago Area Draft Resisters' * * * [and] for the purpose of chilling the exercise of right[s] secured to the Defendant by the First Amendment * * *." He now argues that if he had proved the alleged purpose he would have established prosecutorial discrimination violative of the equal protection guarantee embodied in the Fifth Amendment's due process clause (see Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884), and that the district court's denial of an evidentiary hearing thereon requires reversal.

In Oyler v. Boles, 368 U.S. 448, 82 S. Ct. 501, 7 L.Ed.2d 446, habeas corpus petitioners contended that West Virginia's habitual criminal statute was applied only to a minority of persons in violation of the equal protection clause of the Fourteenth Amendment. The discrimination was documented by statistical data appended to the habeas corpus peti-

---

5. Defense counsel concedes that the 1967 classification card was valid in the sense that it was issued in ordinary course and as part of the classification process. The same is true of the 1968 and 1969 cards.

6. In *Hertlein* the court held the local draft board was deprived of jurisdiction to take any further action regarding the registrant's classification once the regis-

trant had filed an appeal from a classification of the local board, just as a lower court's jurisdiction is terminated when an appeal is taken. 143 F.Supp. at 745. From that the court concluded that the board was without power to reclassify the registrant during the pendency of his appeal and hence that the registrant had no duty to carry the card noticing that reclassification. *Id.* at 746.

tions. The Supreme Court rejected the contention and concluded by saying:

"Moreover, the conscious exercise of some selectivity * * * is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged." 368 U.S. at 456, 82 S.Ct. at 506.

Defendant here contends he has alleged a denial of equal protection since he stated his prosecution was based on an equally unjustifiable standard, i. e., to punish him for and chill him in exercising First Amendment rights.

██ However, the mere fact that some of the 25,000 registrants who had turned in their draft cards were not indicted does not show the existence of any intentional, invidious discrimination. Oyler v. Boles, *supra;* Edelman v. California, 344 U.S. 357, 359, 73 S.Ct. 293, 97 L.Ed. 387; Moss v. Hornig, 314

F.2d 89, 92–93 (2d Cir. 1963). Notably appellant did not allege that other registrants had not been prosecuted for the same or equivalent offenses.[7] Moreover, appellant's status as a draft counselor with the Chicago Area Draft Resisters hardly shows the invidious discrimination he alleged. Federal prosecutors certainly cannot be expected to spend what would be an enormous portion of their time seeking indictments against all Selective Service registrants who have violated the card possession requirements, and it is unquestionably a legitimate enforcement technique to seek indictments against a notorious violator or counselor of others in order to deter other violators and secure general compliance. Thus even accepting these facts as true, no constitutional violation would be proven, and what is left is appellant's naked assertion of an improper prosecutorial motive. See Dear Wing Jung v. United States, 312 F.2d 73 (9th Cir. 1962).[8]

██ This is not a case in which the lower court could have inferred invidious discrimination from a pattern of selective enforcement against members of a distinct race, religion, sex or other

7. See, *e. g.,* O'Brien v. United States, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672; United States v. Demangone, 456 F.2d 807 (3d Cir.) cert. den., 407 U.S. 914, 92 S.Ct. 2435, 32 L.Ed.2d 689 (1972); United States v. Rehfield, 416 F.2d 273 (9th Cir. 1969), cert. den., 397 U.S. 996, 90 S.Ct. 1137, 25 L.Ed.2d 405; United States v. Littlefield, 410 F.2d 746 (9th Cir. 1969); United States v. Miller, 367 F.2d 72 (2d Cir. 1966), cert. den. 386 U.S. 911, 87 S.Ct. 855, 17 L.Ed.2d 787; United States v. Kime, 188 F.2d 677 (7th Cir.), cert. den., 342 U.S. 823, 72 S.Ct. 41, 99 L.Ed. 622 (1951); United States v. Branigan, 2 SSLR 3125 (S.D. N.Y.1969); United States v. Hertlein, 143 F.Supp. 742 (E.D.Wis.1956).

Of course, prior to the Supreme Court's decision in Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532, the Selective Service System routinely dealt with card non-possession delinquencies by punitively reclassifying the registrants or accelerating their induction dates. (But see the earlier decision in

Oestereich v. Selective Service Bd. No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed. 2d 402; compare the later decision in Breen v. Selective Service Bd. No. 16, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653). In *Gutknecht* the Court outlawed the punitive measure of accelerating induction dates and finally put to rest the punitive reclassification procedure. Notably, although defendant alleged 25,000 registrants who had turned in their draft cards had not been prosecuted, he did not state when these alleged dispossessions occurred, or whether or not the registrants were administratively punished for their conduct under then prevailing practice.

8. In *Dear Wing Jung* the defendant claimed that his prosecution was illegal and in violation of the due process clause in that he was picked out discriminatorily because of his suspected radical leanings. The Ninth Circuit ruled the trial court was correct in denying the pretrial motion to dismiss on this allegation. 312 F.2d at 75.

definable class.[9] See Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L. Ed. 220; Littleton v. Berblin, 468 F.2d 389 (No. 71–1395, 7th Cir. October 6, 1972). Rather, no other evidence having been adverted to, it is apparent that in an attempt to establish intentional, invidious discrimination, appellant wanted to and seemingly would have to resort to probing the actual motives of the government attorney responsible for the decision to seek the indictment. Like inquiries into congressional motives for enactment of legislation, direct inquiries into the actual motivation of the United States Attorney is a hazardous matter. See United States v. O'Brien, 391 U.S. 367, 383–384, 88 S.Ct. 1673, 20 L.Ed.2d 672. There is no precedent for nullifying an otherwise valid prosecution on the basis of what a prosecutor may have to say about the actual motivation prompting the seeking of an indictment. Here appellant's prosecution was justified on the basis of his conduct. He did not allege anything which showed a pattern of invidiously discriminatory enforcement or any facts which were adequate to support the inference of allegedly impermissible purpose. Cf. Snowden v. Hughes, 321 U.S. 1, 8–9, 64 S.Ct. 397, 88 L.Ed. 497. In this posture we think there was no requirement for an evidentiary hearing, consisting of testimony of prosecutorial personnel, for the purpose of delving into the interior motivation of the United States Attorney (or his superiors in the Department of Justice) who made the decision to seek an indictment. Then Judge Burger has stated, " * * * [T]he courts have no power over * * * his [the United States Attorney's] motives as they relate to the execution of his duty within the framework of his professional employment." Newman v. United States, 127 U.S.App.D.C. 263, 382 F.2d 479, 481 (D.C.Cir.1967). And as this Court has observed, "It is not difficult to picture the chaos which would reign if the Attorney General [or his subordinates] were subject to be summoned at the whim of every individual accused of crime in every criminal proceeding." Goldberg v. Hoffman, 225 F.2d 463, 467 (7th Cir. 1955). Without more than was presented to him, the district court properly declined to hold an evidentiary hearing.

 In any event it is apparent from defendant's offer of proof that had the district court held the requested evidentiary hearing, defendant could not have established his claim of invidious prosecutorial discrimination against him.[10] Like the relative rarity of such prosecutions, the fact that defendant's draft-counseling activity was one of the reasons why indictment counts for non-possession of draft cards were sought is not persuasive. As noted earlier, select enforcement of a law against someone in a position to influence others is unquestionably a legitimate prosecutorial scheme to secure general compliance with the law. Especially would this seem true with respect to draft card possession requirements at a time when defiance of the law is widespread. Furthermore, the Government's refusal to dismiss the draft card counts upon de-

9. It is apparent that this is what the Supreme Court was referring to in the passage quoted in the text *supra* from Oyler v. Boles, 368 U.S. at 456, 82 S.Ct. 501 at 506. See The Supreme Court, 1961 Term, 76 Harv.L.Rev. 54, 120–121 (1962).

10. Other than the testimony of the government prosecutor who was called on an offer of proof, the defendant did not indicate what, if any, additional evidence he would have adduced in support of his claim. In this regard we note the prosecutor's explanation that the indictment was ultimately approved by the Department of Justice and that he had "very little to say about the actual decision whether or not to prosecute." Nevertheless, we will put to one side the evidentiary frailty, if not incompetence, of this manner of proof and assume the facts stated in the offer of proof could be proven through this witness. But in the absence of a specification of what other evidence would be introduced, the defendant cannot be heard to complain on the grounds that he might possibly have found some.

fendant's agreement to carry the cards, whereas it may have made such "deals" with others in the past, does not serve to show an intentional, impermissibly discriminatory prosecution against this defendant. Assuming that defendant could prove his allegation and show that substantially identical circumstances obtained in the prior cases (which he did not allege), myriad legitimate reasons, including a decision to abandon an apparently unappreciated and ineffectual leniency, could explain the difference in treatment. Also United States Attorneys, not unlike judges in sentencing, may properly make what are essentially plea-bargaining decisions based in part on their appraisal of individual circumstances, not excluding the defendant's attitude and willingness to profit by a "deal" or dismissal of charges. The wide discretion of the prosecutor and vast array of legitimate explanations make the bare difference in treatment of insignificant probative value.

In this Court defendant seeks to bolster his case by referring to a 1969 memorandum from the Assistant Attorney General in charge of the Criminal Division of the Department of Justice regarding the prosecutive policy in cases of willful non-possession of draft cards.[11] That memorandum was written prior to the decision in Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L. Ed.2d 532, which may well have altered the policy enunciated theretofore. The memorandum, while directing United States Attorneys to hold prosecutions in abeyance pending instructions from the Criminal Division, told them they should decline to prosecute all non-possession cases where the registrant had completed his military service or had his delinquency status reversed by his local board. Falk, of course, had not completed his military obligation, and though his delinquency status was removed by his local board following the *Gutknecht* decision, it is apparent that the removal was only intended to comply with the decision and advise Falk that, contrary to the statement in his original delinquency notice, he was not subject to immediate induction on account of his delinquency. See SSLR Practice Manual, ¶ 1100, 6–68. In sum, defendant has not shown that in the wake of *Gutknecht* it was the Justice Department's policy not to prosecute card obligation violators in his posture. It is therefore unnecessary to mention that the Justice Department could hardly be locked into any rigid prospective policy, much less be estopped from changing that policy, on the basis of said internal memorandum.

Finally defendant relies on United States v. Crowthers, 456 F.2d 1074 (4th Cir. 1972), to support his contention that an invidiously discriminatory prosecution prompted by governmental dislike of his draft-counseling activities and designed to chill them can be inferred in his case. *Crowthers* involved a disorderly conduct regulation and a claim that government officials enforced it discriminatorily against public meetings in the Pentagon concourse according to the officials' agreement or disagreement with the ideas expressed at the meetings. Compelling evidence in that case showed that the regulation was used as a subterfuge for prohibiting the expression of ideas with which the authorities disagreed. Judge Craven stated:

"For officials of the United States government to selectively and discriminatorily enforce 41 C.F.R. § 101–19.304 so as to turn it into a scheme whereby activities protected by the First Amendment are allowed or prohibited in the uncontrolled discretion of these officials violates the defendants' right to equal protection of the laws embraced within the due process of law clause of the Fifth Amendment." 456 F.2d at 1080.

Contrary to the situation in *Crowthers,* here we have no transparent attempt by government officials to prohibit or permit the expression of ideas

---

11. Hearings Before the Senate Judiciary Committee's Subcommittee on Administrative Practice and Procedure, October 29–November 13, 1969, p. 365.

solely according to the content of those ideas. Defendant had no First Amendment right to turn in his draft cards. United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. His draft-counseling activity was not made the subject of the indictment or regulation on which it was based, whereas in *Crowthers,* the public meetings themselves were sometimes deemed offensive and sometimes not. The card-possession regulation did not give the government prosecutors uncontrolled discretion to characterize defendant's conduct as falling within or without the regulation according to their agreement or disagreement with its message. Such discretion, present in *Crowthers,* operated to chill protected expression, but the clear delineation between dispossession of draft cards and protected draft-counseling work inhibits no one from engaging in the latter for fear it may be characterized as the former. Defendant was constantly free to engage in his draft-counseling work, and in fact was still so engaged at the time of trial. It is simply untenable to infer a governmental purpose to chill protected expression through the vehicle of defendant's prosecution for non-possession of draft cards. And absent the type of highly visible governmental attempt to regulate directly the content of expression present in *Crowthers,* we may not infer an impermissible purpose in prosecuting a person for clearly unprotected conduct simply because he happens also to be engaged in some different activity protected by the First Amendment. In sum, on analysis, the facts defendant alleged or offered to prove have scarcely any more probative value than this, and assuming them all, no conclusion of illicit discriminatory prosecutorial purpose could properly be drawn in this case.

Affirmed.

SPRECHER, Circuit Judge (dissenting).

I respectfully dissent on the sole ground that it was erroneous to exclude defendant's offer to prove that he was singled out in a discriminatory enforcement of law. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); United States v. Crowthers, 456 F.2d 1074 (4th Cir. 1972).

I would reverse and remand for a new trial.