Donald Russell, Circuit Judge, filed a dissenting opinion.

**UNITED STATES of America,**
**Appellee,**

v.

**William Charles EPPINETTE, Jr.,**
**Appellant.**

**No. 73–1362.**

United States Court of Appeals,
Fourth Circuit.

Argued July 17, 1973.

Decided Oct. 3, 1973.

Deborah G. Mailman, Raleigh, N.C. [court-appointed counsel], for appellant.

Malcolm J. Howard, Asst. U. S. Atty. (Thomas P. McNamara, U. S. Atty., for the E. D. N. C., on brief), for appellee.

Norman B. Smith and Smith, Patterson, Follin & Curtis, Greensboro, N. C., on brief for amicus curiae, North Carolina Civil Liberties Union Legal Foundation, Inc.).

Before CRAVEN, BUTZNER, and RUSSELL, Circuit Judges.

BUTZNER, Circuit Judge:

William Charles Eppinette, Jr. appeals from a judgment of conviction for failure to keep his selective service registration certificate and classification notice in his personal possession. We reverse the judgment and remand the case to the district court with instructions to enter a judgment of acquittal because nonpossession of these forms is not a crime punishable under § 12(b)(6) of the Selective Service Act of 1948, 50 U.S.C. App. § 462(b)(6) (1970).

On December 13, 1971, Eppinette returned his registration certificate and notice of classification to his local selective service board as a protest against the Vietnam War. In response, the board sent Eppinette a letter advising him that the law required him to keep the cards in his personal possession. The board also enclosed a form for requesting new cards. When Eppinette advised the board that he did not want any new cards, he was indicted for violating § 426(b)(6),[1] convicted, and sentenced to two concurrent one year prison terms.

The section of the Act that the government accused Eppinette of violating provides:

"Any person . . . who knowingly violates or evades any of the provisions of this title or rules or regulations promulgated persuant thereto relating to the issuance, transfer, or possession of [a Selective Service] certificate, shall, upon conviction, be fined not to exceed $10,000 or be imprisoned for not more than five years, or both." 50 U.S.C. App. § 462(b)(6) (1970).

The United States does not contend that Eppinette violated any of the specific prohibitions in the Act. Instead, it asserts that Eppinette violated § 462(b)(6) by failing to comply with selective service regulations that require a registrant to have his registration certificate and notice of classification in his

---

1. The indictment charged:

"FIRST COUNT

"Beginning on or about the 20th day of December, 1971, and continuing thereafter, in the Eastern District of North Carolina, WILLIAM CHARLES EPPINETTE, JR. willfully and knowingly did fail and neglect to perform a duty required of him under and in the execution of the Military Selective Service Act, as amended, and the rules, regulations and directions duly made pursuant thereto, in that he did fail and neglect to have in his personal possession his registration certificate (SSS Form No. 2–A), in violation of the provisions of Title 50, App., United States Code, Section 462(b)(6).

"SECOND COUNT

"Beginning on or about the 20th day of December, 1971, and continuing thereafter, in the Eastern District of North Carolina, WILLIAM CHARLES EPPINETTE, JR. willfully and knowingly did fail and neglect to perform a duty required of him under and in the execution of the Military Selective Service Act, as amended, and the rules, regulations and directions duly made pursuant thereto, in that he did fail and neglect to have in his personal possession his Notice of Classification (SSS Form 110), in violation of the provisions of Title 50, App., United States Code, Section 462(b)(6)."

personal possession at all times.[2] The government claims that the statute makes failure to comply with these regulations a crime punishable by imprisonment or fine. In support of this contention, it cites recent decisions upholding similar convictions based on indictments brought under § 462(a).[3] We decline to follow the decisions on which the government relies because they do not accord with our interpretation of the statutes and the regulations. *See generally* Dranitzke, Possession of Registration Certificates and Notices of Classification by Selective Service Registrants, 1. Sel.Serv.L.Rptr. 4029 (1968).

██ Section 462(b)(6), as the general clause which follows the description of five specific crimes, must be construed in light of the statute of which it is a part. *See* Weyerhaeuser Steamship Co. v. United States, 372 U.S. 597, 600, 83 S.Ct. 926, 10 L.Ed.2d 1049 (1963); Jarecki v. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961). This canon of·statutory construction is particularly applicable to § 462(b)(6) because the section is part of a criminal statute that must be strictly construed.

2. Although the district court granted Eppinette's motion for a bill of particulars, the record on appeal does not contain any written specification of the exact regulations upon which the government was relying. The apparent failure to file the bill of particulars creates some confusion because the regulations were amended once just before Eppinette returned his cards and they were amended again shortly before his trial. *See* 36 Fed.Reg. 23373, 23378 (1971); 37 Fed.Reg. 17964, 17965, 17967 (1972). The assistant United States attorney, however, orally informed the court and Eppinette's counsel that he relied on the regulations in effect when Eppinette returned his draft cards, and since the changes in the regulations are not material to the question before us, the omission of the bill of particulars does not affect his appeal.

The pertinent regulations provide:

"Effect of failure to have unaltered registration certificate in personal possession.

Every person required to present himself for and submit to registration must, after he has registered, have in his personal possession until his liability for training and service has terminated his Registration Certificate . . . prepared by his local board which has not been altered and on which no notation duly and validly inscribed thereon has been changed in any manner after its preparation by the local board. The failure of any person to have his Registration Certificate . . . in his personal possession shall be prima facie evidence of his failure to register. When a registrant is inducted into the Armed Forces or enters upon active duty in the Armed Forces, other than active duty for training only or active duty for the sole purpose of undergoing a physical examination, he shall surrender his Registration Certificate . . . to the commanding officer of the Armed Forces Examining and Entrance Station or to the responsible officer at the place to which he reports for active duty. Such officer shall return the certificate to the local board that issued it. 32 C.F.R. § 1617.1 (1972).

"Persons required to have Notice of Classification (SSS Form 110) in personal possession.

Every person who has been classified by a local board must have in his personal possession until his liability for training and service has terminated a valid Notice of Classification . . . issued to him showing his current classification. When any such person is inducted into the Armed Forces or enters upon active duty in the Armed Forces, other than active duty for training and only or active duty for the sole purpose of undergoing a physical examination, he shall surrender his Notice of Classification . . . to the commanding officer of the Armed Forces Examining and Entrance Station or to the responsible officer at the place to which he reports for active duty. Such officer shall return the notice to the local board that issued it." 32 C.F.R. § 1623.5 (1972).

3. United State v. Demangone, 456 F.2d 807 (3d Cir. 1972); United States v. Couming, 445 F.2d 555 (1st Cir.), cert. denied, 404 U.S. 949, 92 S.Ct. 291, 30 L.Ed.2d 266 (1971); Zigmond v. Selective Service Local Board No. 16, 396 F.2d 290 (1st Cir.), cert. denied, 391 U.S. 930, 88 S.Ct. 1831, 20 L.Ed.2d 851 (1968). *See also* United States v. Kime, 188 F.2d 677 (7th Cir.), cert. denied, 342 U.S. 823, 72 S.Ct. 41, 96 L.Ed. 622 (1951); United States v. Hertlein, 143 F.Supp. 742 (D.Wis.1956). The Supreme Court granted certiorari in a case presenting the issue, but did not decide the point. United States v. O'Brien, 391 U.S. 367, 372, 88 S.Ct.· 1673, 20 L.Ed.2d 672 (1968). *O'Brien* dealt with the mutilation and destruction of draft cards—conduct expressly proscribed by § 462(b).

*Cf.* United States v. Campos-Serrano, 404 U.S. 293, 297, 92 S.Ct. 471, 30 L.Ed. 2d 457 (1971); Rewis v. United States, 401 U.S. 808, 812, 1056, 28 L.Ed.2d 493 (1972). The first five subsections of § 462(b) outlaw fraudulent transfers of registration certificates, fraudulent possession of a certificate that has not been duly issued to the person possessing it, alteration or destruction of a certificate, fraudulent printing of a likeness of a certificate, and knowing possession of a forged or altered certificate.[4] All five of the subsections are concerned with the destruction or fraudulent use and possession of certificates; none of them mention any requirement that a registrant possess certificates that have been duly issued to him. Therefore, the natural construction of the sixth subsection is that it reaches frauds which the statute did not expressly cover, but it does not punish the nonpossession of a validly issued certificate when no fraud has been committed.

■ This construction of § 462(b)(6) accords with the congressional intent as expressed in the legislative history. Statutes enacted prior to the Selective Service Act of 1948 contained no statutory provisions analogous to § 462(b). The Senate Report of the 1948 Act explains the new provision as follows.

"False certification.—This subsection does not appear in the 1940 act. It establishes a fine of not to exceed $10,000, or imprisonment not to exceed 5 years, or both, as the penalty for the false use of selective-service certificates and related papers." S. Rep.No.1268, 80th Cong., 2d Sess., 2 U.S.Cong.Serv. 1989, 2008 (1948).

There is no suggestion in the report that the Senate intended the Act to punish simple nonpossession of draft cards when no fraudulent conduct is involved. The House version of the Act did not have a provision similar to § 462(b), but the conference committee accepted the Senate version. The conference managers of the House explained the conference bill as follows:

"The Senate bill provided specific penalties for those forging or altering certificates issued under the act and for persons possessing or using any such forged or altered certificates. The House amendment contained no comparable provisions. The conference agreement adopts the provisions of the Senate bill with respect to this matter." Conf.R.No.2438, 80th Cong., 2d Sess., 2 U.S.Cong.Serv. 2011, 2017 (1948).

---

4. 50 U.S.C.App. § 462(b) provides:
"Any person (1) who knowingly transfers or delivers to another, for the purpose of aiding or abetting the making of any false identification or representation, any registration certificate, alien's certificate of nonresidence, or any other certificate issued pursuant to or prescribed by the provisions of this title, or rules or regulations promulgated hereunder; or (2) who, with intent that it be used for any purpose of false identification or representation, has in his possession any such certificate not duly issued to him; or (3) who forges, alters, knowingly destroys, knowingly mutilates, or in any manner changes any such certificate or any notation duly and validly inscribed thereon; (4) who, with intent that it be used for any purpose of false identification or representation, photographs, prints, or in any manner makes or executes any engraving, photograph, print, or impression in the likeness of any such certificate, or any color-able imitation thereof; or (5) who has in his possession any certificate purporting to be a certificate issued pursuant to this title [said sections], or rules and regulations promulgated hereunder, which he knows to be falsely made, reproduced, forged, counterfeited, or altered; or (6) who knowingly violates or evades any of the provisions of this title [said sections] or rules and regulations promulgated pursuant thereto relating to the issuance, transfer, or possession of such certificate, shall, upon conviction, be fined not to exceed $10,000 or be imprisoned for not more than five years, or both. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of any certificate not duly issued to him, such possession shall be deemed sufficient evidence to establish an intent to use such certificate for purposes of false identification or representation, unless the defendant explains such possession to the satisfaction of the jury."

We attach particular importance to this legislative history because the Act contains no language expressly making the nonfraudulent failure to possess validly issued draft cards a crime. Only a strained construction of the Act, inconsistent with its legislative history, would countenance Eppinette's punishment for his simple failure to retain in his personal possession the draft cards that were issued to him. "But when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication." United States v. Universal C. I. T. Credit Corp., 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). We, therefore, hold that Congress did not intend § 462(b)(6) to punish nonpossession of validly issued Selective Service documents in the absence of fraud.

■■■ Our interpretation of § 462(b)(6) is also consistent with the regulations that the government accused Eppinette of violating.[5] At the outset, we observe that the provision that a registrant "must" have in his personal possession certain documents does not require us to interpret the regulations as mandatory. Dependent upon the context, verbs that ordinarily denote the imperative sometimes should be construed as directory only. Because the administrative history of the regulations evidences an intent to limit criminal penalties to fraudulent use or possession of certificates, we believe the requirement that registrants have their draft cards in their personal possession is directory, not mandatory. Cf. United States v. Reeb, 433 F.2d 381, 383 (9th Cir. 1970),

cert. denied, 402 U.S. 912, 91 S.Ct. 1391, 28 L.Ed.2d 654 (1971); Thompson v. Clifford, 132 U.S.App.D.C. 351, 408 F.2d 154, 158 (1968).

The administrative purpose is most explicit with regard to the regulation requiring possession of registration certificates, which provides:

"Effect of failure to have unaltered registration certificate in personal possession.

Every person required to present himself for and submit to registration must, after he has registered, have in his personal possession until his liability for training and service has terminated his Registration Certificate . . . The failure of any person to have his Registration Certificate . . . in his personal possession shall be prima facie evidence of his failure to register. . . ." 32 C.F.R. § 1617.1 (1972).

The regulation on its face refutes any intention to make nonpossession a criminal violation. The title indicates that the regulation is designed to explain the effect of nonpossession of a registration certificate, and the second sentence of the regulation says that nonpossession is prima facie evidence of failure to register. There is no warning that nonpossession is a violation of the regulations punishable by criminal penalties. The omission of an explicit statement that nonpossession is a violation is especially significant because a predecessor regulation contained a provision making nonpossession a violation,[6] but this portion of the regulation was later repealed [7] Moreover, a parallel regulation, which prohibited fraudulent use of certificates, contained a "violation" clause,[8] and the current regulations expressly make fraudulent use of a notice of classification a violation.[9]

---

5. See note 2, *supra*.

6. 6 Fed.Reg. 1796 (1941).

7. 7 Fed.Reg. 9683 (1942).

8. 7 Fed.Reg. 2086 (1942).

9. 32 C.F.R. § 1623.6 (1972).

The service's explanation for adopting the regulation supports our interpretation:

"In the early stages of the 1940–47 operation, it was found most difficult to affirmatively establish that a person required to do so, had not registered. To avoid this difficulty Selective Service provided by regulation that all registered persons must have with them at all times their 'registration cards.' It was a far simpler matter to ask a man for this certificate than to establish that he had not registered in any of the 120,000 places where he might have registered." Selective Service System, Evaluation of the Selective Service Program 122 (Special Monograph No. 18, 1967).

■ We hold, therefore, that the regulation should be read as it is written. The effect of the failure to have an unaltered registration certificate in one's personal possession is prima facie evidence of one's failure to register. There is no justification for judicially engrafting a provision that the omission is also a crime punishable by imprisonment. The nation's youth are entitled at the very least to have their selective service obligations stated with clarity.

The service's regulatory framework compels a similar interpretation of the notice of classification regulation, which provides:

"Persons required to have Notice of Classification . . . in personal possession.

Every person who has been classified by a local board must have in his personal possession until his liability for training and service has terminated a valid Notice of Classification . . . issued to him showing his current classification." 32 C.F.R. § 1623.5 (1972).

The regulation omits any statement that nonpossession is a violation of the regulation. In contrast, the following regulation prohibiting fraudulent possession or use of classification notices, expressly says that this conduct "shall be a violation of these regulations." 32 C.F.R. § 1623.6 (1972).[10]

In sum, the texts of the statute and of the regulations and the relevant legislative and administrative history convince us that Congress did not intend § 462(b)(6) to make nonpossession of a registration certificate or of a notice of classification a criminal offense in the absence of fraud. Accordingly, the judgment of conviction is reversed. The case is remanded to the district court with instructions to enter a judgment of acquittal.[11]

---

10. Section 32 C.F.R. § 1623.6 provides:

"It shall be a violation of these regulations for any person to have in his possession a Notice of Classification . . . issued to some other person, or to permit a Notice of Classification . . . issued to him to be in possession of any other person except as provided in the instructions upon such form; or to falsely make, alter, forge, or counterfeit, or cause or procure to be falsely made, altered, forged, or counterfeited, or to willingly aid or assist another to falsely make, alter, forge, or counterfeit, any Notice of Classification . . . or to utter or publish as true, or cause to be uttered or published as true, or have in his possession with the intent to utter or publish as true, any such false, altered, forged, or counterfeited Notice of Classification . . . or to exhibit or present to any person any such false, altered, forged, or counterfeited, Notice of Classification . . . knowing the same to be false, forged, altered or counterfeited."

11. In view of our disposition of the case, we find it unnecessary to reach Eppinette's defenses of constructive possession and selective prosecution. To support those claims, Eppinette sought discovery of the number of prosecutions for returning draft cards as a means of dissent. The statistics published by the Selective Service System do not provide this information. Selective Service System Special Monograph 14 at page 89 (1950) states that the 189 convictions for failure to possess registration certificates and the 70 convictions for failure to possess classification notices include cases of possession of false or altered certificates and notices. The district court, nevertheless, denied discovery. The record, therefore, does not show the extent to which persons have been prosecuted for returning draft cards as an expression of dissent or even for simply failing to possess the cards when no fraud was involved.

DONALD RUSSELL, Circuit Judge (dissenting):

Selective Service Regulations explicitly command all registrants to have in their possession at all times their classification card.[1] The authority to issue such Regulations is specifically conferred in Section 10(b) of the Selective Service Act of 1948, later codified as Section 460 (b)(1), 50 App.U.S.C., 1970, which vested the President with the power "to prescribe the necessary rules and regulations to carry out the provisions of this title."[2] Section 12(b) of that Act, later codified as Section 462(b), 50 App.U. S.C., 1970, provides that a violation of any regulation so issued may be punishable as a crime.

The defendant admittedly violated the Regulation with reference to the possession of his classification card. Indeed, he violated it intentionally, purposefully, even defiantly. For such defiant and intentional violation he was prosecuted and convicted.

The majority opinion reverses his conviction arising out of such defiant violation. I dissent.

The majority opinion posited its reversal largely on the conclusion that Congress never intended, by enacting the statutory authorization under which the prosecution was had, to authorize prosecution under a regulation for nonpossession of a classification card, where some element of fraud was not a part of the offense. It arrives at this conclusion by finding that, though § 462(b)(6), which is the section under which the prosecution was had, makes no reference whatsoever to fraud but provides simply that any violation of a regulation promulgated under "any of the provisions *of this title*" is punishable, fraud must be read into it as an essential element of any regulation that would support a

prosecution thereunder. It justifies this result by reasoning that, since the five specific offenses earlier listed in § 462(b) include, by express language, an element of fraud, subdivision (b)(6) must be read as requiring likewise fraud as an essential element of the crime provided thereunder, even though, as I have said, there is absolutely no language in subdivision (b)(6) to support this construction. The opinion passes over without comment that subdivision (b)(6) is detached from the preceding five parts of § 462(b) by the disjunctive "or", which, under normal rules of statutory construction, "indicates alternative circumstances" and is "intended to identify and define a wholly separate and distinct offense * * *." Adolfson v. United States (9th Cir. 1947) 159 F.2d 883, 886, cert. denied 331 U.S. 818, 67 S.Ct. 1307, 91 L.Ed. 1836, Barkdoll v. United States (9th Cir. 1945) 147 F.2d 617, 618. Contrary to the view of the majority opinion that subsection (b)(6) is merely a "catch-all" to authorize regulations providing for punishment involving some element of fraud similar to the other parts of subsection (b), the language of (6) makes it clear that the regulation, the violation of which was made punishable by (6), was not narrowly confined in character by the preceding parts of (b) but was as broad and as inclusive as "the provisions of this title." And "title", a term repeatedly used throughout the Act,[3] had a very definite application; it covered all the provisions of the Act. It was not limited to the fraudulent aspect of the preceding parts of (b) but embraced all the other parts of the Act, including § 462(a). This is conclusively established by the use of the term "title," repeatedly in other provisions. Thus, in the very section which vests the President with the power to prescribe regulations, the Act provides that such

---

1. Selective Service Regulations, 32 C.F.R. § 1623.5.

2. *See*, U.S.Code Congressional Service, 80th Congress, 2nd Sess. at 632.
   The majority opinion in its discussion, goes back to the 1948 Act itself. I have done so,

too; and subsequent references are generally to that Act, unless otherwise stated.

3. *See* Section 1(d) Section 4(a) and the very title of the Act of 1948, in all of which the term "this title," in fixing the scope of the section, was used.

power extends to any rules and regulations "necessary * * * to carry out the provisions of this title." That is the scope of the regulations, the violation of which may be punishable under § 462(b)(6), with one limitation stated in (6) itself and that is that any such regulation must relate to "the issuance, transfer, or possession of such certificate." This regulation met that test: it did relate to possession and it was issued under the power of the President to issue regulations "necessary * * * to carry out the provisions of this title."

That (b)(6) is not restricted by the preceding parts of (b) in the type of regulation thereby made punishable finds additional support in the "editorial assistance" attached to the section. Thus, after the provision of the section authorizing punishment for a violation of any regulation promulgated under "any of the provisions of this title," the editors in the official code have added in brackets "said sections." This term, "said sections," refers back to an earlier use of the term, "provisions of this title," which the editors, in brackets, then identified as "sections 451, 453, 454, 455, 456 and 458–471 of this Appendix," in other words, the requirements of the Act as a whole.

To sum up this phase of the matter: Subsection (b)(6) does not by its terms or by implication limit the power to punish thereunder for a violation of a regulation that involves an element of fraud but, on the contrary, expressly authorizes punishment for a violation of any regulation issued under the general authority to prescribe regulations if the regulation relates, among other things, to "possession" of a registrant's classification card.

And I find nothing in the legislative history cited in the majority opinion that will give support to the forced construction adopted. There was nothing really new in subsection (b)(6). With little variation in language, it had been a part of every Selective Service Act enacted over the years since 1917. It appeared as Section 6 of the 1917 Act and Section 11 of the 1940 Act and was in the House bill as the initial sentence in Section 11. It was repeated in both Sections 12(a) and (b)(6), and prosecution may be had under either. See, United States v. Demangone (3rd Cir. 1972) 456 F.2d 807, 811, cert. denied 407 U.S. 914, 92 S.Ct. 2435, 32 L.Ed.2d 689. However, the first five parts of § 462(b) were new and were added, as the Conference Report states, in the Senate. It is normal legislative procedure to indicate in the Conference Report any new sentences or terms that may have been added by the Senate to a bill originating in the House. There is, of course, no necessity to point out terms or provisions that are not new. I find, therefore, no significance in the absence of any reference to subsection (b)(6) or any reference to Regulations promulgated thereunder by the Selective Service Director in the Conference Report on Section 462 (b). Certainly, the scanty reference to subsection (b)(6) in the Conference Report will not justify giving to that provision a meaning and a construction that does not accord with its plain language or that would give to the term "this title" a different meaning from that in which that term is used throughout the Act.

The majority opinion, it is true, does not entirely predicate its conclusions on a construction of the statute itself but would find that the intent of the regulation in its requirement of possession by the registrant of his classification card at all times was that its requirement was "directory" rather than "mandatory" and without punitive purposes. It is difficult to understand how such intent can rationally be assumed in the light of the fact that, since 1945, at least, there have been repeated prosecutions of registrants for nonpossession under the provision. Such action is a convincing answer to this assumption in the majority opinion. See, also, United States v. Couming (1st Cir. 1971) 445 F.2d 555, 556, cert. denied 404 U.S. 949, 92 S.Ct. 291, 30 L.Ed.2d 266.

This conclusion of mine is in accord with the decisions of the other Circuits which have considered the issue. In an unbroken line of decisions stretching back to 1945, federal courts, without a single dissenting voice, have consistently held that a violation of this regulation or one similar to it, and having similar statutory basis, requiring the registrant to have on his person at all times his registration card, was punishable as a crime.[4] No one of those decisions found any invalidity in the regulation or want of authority in the enabling provisions as expressed in (6), or in earlier provisions of the preceding Acts. In one of these decisions, the Court meticulously analyzed the points made in the majority opinion favoring invalidity of the very regulation involved here, including Professor Dranitzke's thesis, and concluded that the Regulation was valid and would support a conviction. United States v. Couming, *supra*. On at least three occasions the Supreme Court had an opportunity to correct that construction of such a regulation and its supporting statutory authority if it deemed that construction incorrect.[5] It did not do so.[6] It is significant that one of those decisions in which the Supreme Court refused certiorari, was the one which had dismissed as without merit the very considerations on which the majority opinion largely bases its conclusions. United States v. Couming, *supra*. It is even more significant that Professor Dranitzke, in the article which the majority opinion cites as support for its conclusion, concedes: "(A)nd United States v. O'Brien, the only Supreme Court case near point, states 'we are not concerned here with the nonpossession regulations * * *.' Yet it should be noted that the Court does imply that nonpossession is punishable as a felony." 1 SSLR 4034.

Since 1940, scores of individuals have been indicted, convicted and imprisoned for violation of this regulation or one substantially like it based on earlier legislation having a provision similar to 462(b)(6). In the period between 1940 and 1946, there were 189 convictions relating to possession of a registration certificate and 70 convictions relating to possession of notice of classification.[7] It is quite likely that violations and prosecutions accelerated during the Korean and Viet-Nam involvements. If these prosecutions were, as the majority opinion finds, based on an erroneous construction of executive power never authorized or intended by Congress, it is inconceivable that Congress would have stood silently by, permitting the executive by such a misuse of Congressional

4. The cases to this effect are cited in note 3 of the majority opinion. To these should be added United States v. Minder (D.C.Cal.1945) 63 F.Supp. 369, aff. per curiam, 157 F.2d 856; Wills v. United States (9th Cir. 1967) 384 F.2d 943, 946, cert. denied 392 U.S. 908, 88 S.Ct. 2052, 20 L.Ed.2d 1366, reh. denied 393 U.S. 898, 89 S.Ct. 66, 21 L.Ed.2d 185; United States v. Smith (D.C.Iowa 1966) 249 F.Supp. 515, 518, aff. 368 F.2d 529.

5. It has, of course, been often stated that a a denial of certiorari "imports no expression of opinion upon the merits of the case" United States v. Carver (1923) 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361, but merely that "not four members of the Court [who] thought the case should be heard," Brown v. Allen (1953) 344 U.S. 443, 492, 73 S.Ct. 397, 439, 97 L.Ed. 469, reh. denied, 345 U.S. 946, 73 S.Ct. 827, 97 L.Ed. 1370 (Justice Frankfurter's opinion), yet the fact remains, as Justice Jackson so trenchantly expressed it in his concurring opinion in Brown v. Allen, 344 U.S. at 543, 73 S.Ct. at 428 that, "[L]awyers and lower judges will not readily believe that Justices of this Court are taking the trouble to signal a meaningless division of opinion about a meaningless act. It is just one of the facts of life that today every lower court does attach importance to denials [of certiorari] and to presence or absence of dissents from denials, as judicial opinions and lawyers' arguments show." *See, also,* Shapiro v. King (D.C.Mo.1941) 38 F.Supp. 33, 35, aff'd. 125 F.2d 890.

6. United States v. Kime (7th Cir. 1951) 188 F.2d 677, cert. denied 342 U.S. 823, 72 S.Ct. 41, 96 L.Ed. 622; Zigmond v. Selective Service Local Board No. 16 (1st Cir. 1968) 396 F.2d 290, cert. denied 391 U.S. 930, 88 S.Ct. 1831, 20 L.Ed. 851; United States v. Couming, *supra* (445 F.2d 555).

7. Selective Service System Special Monograph No. 14 at 89.

**374**

authority, to convict and imprison scores of citizens over a period of more than three decades. To conceive otherwise is to suggest that Congress was either ignorant of how its laws were being executed or was crassly indifferent to a flagrant and long-continued misuse of its authorizations by the executive department. Such an assumption is, in my judgement, unwarranted. Congress could not have been ignorant of the power exercised by the executive department and it has never shown itself to be indifferent to any misuse of its authorizations by the executive department. Congressional acquiescence in a judicial construction of legislation, consistently followed for more than thirty years, thus hardly justifies the conclusion that this construction is contrary to Congressional intent.

Nor should the construction of Section 462 as authorizing the regulation in question have been unanticipated by Congress or deemed unapproved by it. The Act of 1948 drew upon the Selective Service Act of 1917, 40 Stat. 76. That Act was found to support a regulation requiring every registrant to have "always in his personal possession his registration certificate" and criminal prosecution for a violation of such a regulation had been upheld. United States v. Olson (D.C.Wash.1917) 253 F. 233, 234. It would seem safe to assume that Congress, in enacting the similar Acts in 1940 [8] and 1948 [9] knew of and foresaw that the Selective Service System would issue a similar regulation under the new Acts, and thereby approved by implication the issuance of such a regulation. *See,* District of Columbia v. Johnson & Wimsatt (1947) 82 U.S.App.D.C. 81, 160 F.2d 913, cert. denied 332 U.S. 760, 68 S.Ct. 63, 92 L.Ed. 346; City of Burlington v. Turner (D.C. Iowa 1972) 336 F. Supp. 594.

In the face of these compelling considerations, I cannot agree to the belated discovery that this regulation of the Selective Service System was issued in defiance of Congressional intent or that such regulation was not intended to have punitive consequences, and that all the convictions for violations of the regulation occurring over the last thirty years, approved by the Courts and acquiesced in by Congress, were invalid.

I would affirm the conviction.