UNITED STATES of America,
Appellee,

v.

Clarence E. CROWTHERS et al., and
Nathaniel W. Pierce et al.,
Appellants.

No. 71–1313.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 9, 1971.

Decided March 20, 1972.

Lawrence E. Freedman, Alexandria, Va., for appellants.

David H. Hopkins, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on brief), for appellee.

Before WINTER, CRAVEN and FIELD, Circuit Judges.

CRAVEN, Circuit Judge:

This is a consolidated appeal from decisions of the district court affirming convictions entered by a United States Magistrate for violations of government regulations said to have occurred during several "Masses for peace" in the Pentagon public concourse during November 1969 and June 1970. The question presented is whether the First Amendment rights of speech and assembly may be exercised in a public concourse of the Pentagon. We think so, and because we conclude that the regulations under which defendants were prosecuted were selectively and unequally applied, we reverse the convictions obtained under § 19.304 without the necessity of considering appellants' contention that the regulation is void for vagueness and overbreadth. The convictions obtained under § 19.307a must be reversed because the regulation contains no standards for approving or disapproving the distribution of printed matter and is void as a prior restraint on freedom of speech.

I

The facts in these cases are virtually agreed. But the government and the defendants are unable to agree on the adjectives describing the admitted activities of defendants. Defendants insist they were conducting religious ceremonies; the government insists it undertook to stop political demonstrations. We think both are right and that the choice of words affords no leverage for decision. Bishop Crowther and others joined with him were arrested for conducting and participating in what they termed a "Mass for peace" in the Pentagon concourse on November 13, 1969. Father Pierce and others joined with him were arrested for similar conduct and for distributing leaflets during Masses on June 15–19, 1970. The GSA regulations under which they were arrested are as follows:

41 C.F.R. § 101–19.304 Disturbances.

The disorderly conduct on property, or conduct on property which creates loud and unusual noise, or which obstructs the usual use of entrances, foyers, corridors, offices, elevators, stairways, and parking lots, or which otherwise tends to impede or disturb the public employees in the performance of their duties, or which otherwise impedes or disturbs the general public from obtaining the administrative services provided on property, is prohibited. The occupant agency involved in a disturbance shall have the initial responsibility for coordinating

the observance of this rule by the public.

41 C.F.R. § 101–19.307a Distribution of handbills.

The distribution of material such as pamphlets, handbills, and flyers, is prohibited without prior approval of an authorized official of the agency occupying the space where the material is to be distributed.

The concourse is about 1,000 feet in length and about 500 feet in width, is open to the public, and serves primarily as a way of ingress and egress for Pentagon employees. Several shops are located in the concourse for the convenience of the employees, and although they are forbidden to advertise their presence at the Pentagon to the general public, patronage is not limited to Pentagon employees. The area has been used for religious, recreational, and awards assemblies authorized by Pentagon officials. In the latter half of 1969 it was so used 16 times—including band recitals and a speech by the Vice President. The parties agree that the leafletting caused no disruption—leaflets were simply offered to willing takers. The Mass on November 13 lasted for about 25 minutes and was accompanied by singing and handclapping. About 185 people participated in this Mass. The noise level was said to be loud, but appellants persuasively claim that it was no greater and even less than that of similar activities such as band recitals allowed by the government. The participants behaved peacefully and were kept in a tight-knit group by their own marshalls. The Mass attracted onlookers— personnel of the Department of Defense, members of the public present in the concourse, and members of the press. Some obstruction was caused by the onlookers. During the events of June 15–19, 1970 (except on June 16), onlookers again caused some obstruction. The events of those days may be summarized thus:

June 15—After a liturgical procession of five individuals, and Episcopal priest began reading the Mass in a very low voice. Within seconds, GSA guards read the regulation and arrested the participants.

June 16—A group of 12 people knelt in a circle. An Episcopal priest began the Episcopal Service of Holy Communion in a very low voice. A GSA guard read the regulation and arrested the participants.

June 17—Eight persons knelt in a circle and were arrested. The congestion was sufficient that a GSA guard testified he feared that the plate glass window of a drugstore would break. It did not.

June 18—Forty-two persons knelt in a circle and there was again testimony of concern over the congestion caused by onlookers.

June 19—A procession of individuals recited Psalm 102. Nine were arrested.

The November 1969 group sought no permission for their demonstration. Permission was sought and denied for the June 1970 Masses. No permission was sought to leaflet.

II

We reject defendants' first defense that the statute authorizing General Services Administration to promulgate the regulations, 40 U.S.C. § 318, is an unconstitutional delegation of legislative power by the Congress. It has been settled otherwise in this circuit. United States v. Cassiagnol, 420 F.2d 868, 875–877 (4th Cir. 1970).

As previously indicated, because we decide the case on a narrower ground, we need not consider defendants' serious contention that Paragraph 6 of the GSA regulations is unconstitutional because of vagueness and overbreadth. We assume, for purposes of decision, that the regulation is facially constitutional.

The November 13, 1969, charge under the regulation boiled down to an accusation that the defendants conducted themselves so as to create loud and unusual noise, or to obstruct the usual use of entrances, foyers, corridors, offices,

elevators, stairways and parking lots, or conduct otherwise tending to impede or disturb public employees in the performance of their duties, or disturbed or impeded the general public from obtaining the administrative services provided in the Pentagon concourse. There is not one scintilla of evidence in the record supporting the accusation that either the general public or Pentagon employees were impeded or disturbed. The ceremonies, whether religious or political, were timed to coincide with the normal lunch hour. That a crowd gathered to watch scarcely supports an inference that the public and/or employees of the Pentagon were disturbed or impeded from normal activity.

■ There is more to the accusation that the defendants created loud and unusual noise and obstructed the usual use of the concourse. We think there was substantial evidence to support the magistrate's findings that the defendants created loud and unusual noise and obstructed [1] the usual use of entrances, corridors, etc. Nothing else appearing, the convictions would have to be affirmed.

■ But there is more. Mention has already been made of the 16 other occasions during the latter half of 1969 when the concourse was permitted to be used for both political and religious ceremonies. Beyond question, the government may forbid all ceremonial use of the concourse or any other portion of the Pentagon. But it may not pick and choose for the purpose of selecting expressions of viewpoint pleasing to it and suppressing those that are not favored. It is absurd to argue that defendants' guitar, or the quiet recitation of the 102 Psalm, or the whispered administration of Communion, creates loud and unusual noise and that a band recital does not. The record does not disclose the number of people attending the appearance of the Vice President, nor does it disclose attendance at all of the approved religious ceremonies. But the record does disclose that except on November 13 there were pitifully few participants in the Episcopal Masses for peace. We think when the record strongly suggests invidious discrimination and selective application of a regulation to inhibit the expression of an unpopular viewpoint, and where it appears that the government is in ready possession of the facts, and the defendants are not, it is not unreasonable to reverse the burden of proof and to require the government to come forward with evidence as to what extent loud and unusual noise and obstruction of the concourse may have occurred on other approved occasions. It is neither novel nor unfair to require the party in possession of the facts to disclose them. Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 192 (4th Cir. 1961). We think defendants made a sufficient prima facie showing that application of the noise and obstruction regulation to them was pretensive and that the government, being in possession of the facts as to noise and obstruction of approved activity, should have come forward with evidence, if it could, to rebut the inference of a double standard.

■ But we need not rest decision upon reversal of the ordinary burden of proof. Although the facts with respect to noise and congestion at the 16 approved ceremonies were not fully developed, there is enough in the record to show unequal and oppressive application of the regulations to these defendants. As many as 450 persons attended one approved religious service—far more than the 185 in attendance on November 13, and many times those in attendance during the June incidents. Colonel Ligon testified that the West Point Cadet Choir was "a little louder, a little more noise" than there was on the 13th of

---

[1]. Defendants themselves obstructed nothing. The government, however, attempts to impute to them obstruction caused by onlookers. However doubtful such an imputation may be, we assume, purely for purposes of this case, without deciding, that the imputation is correct and reasonable.

November. Another witness conceded, as it would seem he must, that when a band is playing some unusual noise results. The record further indicates that on some previous occasions a portion of the south end of the concourse, including the stage and the entrances defendants were charged with obstructing, were cordoned off by curtains, thus suspending their normal use for the period of the activity. Suffice it to say that the record establishes that the level of noise and obstruction attributed to these defendants could not possibly have exceeded the level of noise and obstruction previously permitted by the government on numerous prior approved occasions.

But the government seriously contends that it may lawfully bar "political" activity at the Pentagon, and insists that defendants' activities were "nothing but political though trimmed with religious trappings."

The First Amendment of the Constitution of the United States reads:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

It is established beyond all argument that the government may not favor one religion over another. It may not choose to permit an Episcopal prayer service for the health of the President and in support of the Armed Forces and deny a Quaker (or Episcopal) prayer service to end all war or even the Vietnam War. It may no more dictate the content of a religious service than it may establish a state religion.

Neither may the government flatly deny the right of the people peaceably to assemble to petition the government for a redress of grievances —even those relating to foreign policy. Thus it may not stop demonstrations. It may, however, regulate and control demonstrations so long as it does so with fine impartiality. Doubtless the Pentagon could establish reasonable regulations governing the number of persons who may be admitted for demonstration purposes to the public area of the concourse, where they may congregate, and maximum permissible noise level. See Blasecki v. Durham, 456 F.2d 87 (4th Cir. 1972). What it cannot do is to permit meetings open to the public of which it approves and refuse to permit meetings open to the public of which it disapproves.

Our holding is a very narrow one. We do *not* hold that the government may not lawfully close the concourse of the Pentagon to public access. We do *not* hold that it may not forbid all meetings of any and every sort whatsoever within the concourse. We do *not* hold that it may not reasonably control public meetings in the concourse by the application of objective standards fair to all. All that we do hold is that it may not permit public meetings in support of government policy and at the same time forbid public meetings that are opposed to that policy. It may not accomplish its selective objective by convenient labelling: good ones are religious services and bad ones are demonstrations.

What the government has done here is to undertake to suppress a viewpoint it does not wish to hear under the guise of enforcing a general regulation prohibiting disturbances on government property. In choosing whom to prosecute, it is plain that the selection is made not by measuring the amount of obstruction or noise but because of governmental disagreement with ideas expressed by the accused. This is especially clear as to the services in June of 1970, since it appears the defendants were informed by Regional Counsel of the General Services Administration there was no way they could conduct services in the concourse without arrest. We hold the government may not enforce or fail to enforce 41 C.F.R. § 101–19.304 according to whether it agrees with the views expressed.

In dealing with similar conduct on the part of state officials, the Supreme Court has stated, "It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups whether by the use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute." Cox v. Louisiana, 379 U.S. 536, 557–558, 85 S.Ct. 453, 466, 13 L. Ed.2d 471 (1965). For officials of the United States government to selectively and discriminatorily enforce 41 C.F.R. § 101–19.304 so as to turn it into a scheme whereby activities protected by the First Amendment are allowed or prohibited in the uncontrolled discretion of these officials violates the defendants' right to equal protection of the laws embraced within the due process of law clause of the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

> Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.

Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886).

### III

Those defendants arrested for a violation of 41 C.F.R. § 101–19.307a, regulating leafletting, attack it as being an impermissible restriction on freedom of speech. We agree and hold that 41 C.F. R. § 101–19.307a is void.

The United States government, like that of the individual states, has the power and duty to see that the orderly processes of government continue. In so doing it may pass laws and regulations necessary to carry out this duty. However, the Supreme Court has made it clear that laws which regulate activities protected by the First Amendment must be more than merely rational, and are not accorded the presumption of constitutionality normally accorded to acts of the legislature. United States v. Congress of Industrial Organization, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). Leafletting is such a protected activity, Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), and to abridge this activity the government must have a compelling interest to justify the abridgment and the scope of the abridgment must not be greater than reasonably necessary to serve the government's purpose. Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

We think the government has a substantial interest in the maintenance of cleanliness and beauty of the nation's capital and its governmental environs and that it may adopt reasonable regulations designed to prevent unnecessary littering. Without a doubt, the government may flatly prohibit broadcasting or throwing away pamphlets, handbills, and flyers and require that all such discarded material be placed in receptacles. But 19.307a has nothing to do with littering. It simply prohibits without prior approval all *distribution* of pamphlets, handbills, and flyers. In the context of this case it includes defendants' conduct of peacefully offering leaflets and handbills to those who would accept them. There is no suggestion that defendants scattered leaflets at random. In the public area of the concourse the government itself offers for distribution pamphlets and printed material explanatory of the Pentagon and Armed Forces. The regulation permits distribution when approved by an authorized official of the agency occupying the space. Such a regulation, without objective standards, is void on its face.

Freedom of speech does not depend upon the approval of an authorized official of government. The government may not favor one pamphlet and reject another because the latter displeases the official in charge. To validate such a regulation is to endorse censorship by whim and caprice. We hold this one to be unconstitutional in violation of the First Amendment. Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Thornhill v. Alabama, 310 U.S. 88, 60 S. Ct. 736, 84 L.Ed. 1093 (1940).

The convictions of all defendants for violations of these regulations must be

Reversed.