IN THE SUPREME COURT OF NORTH CAROLINA

No. 197PA20-2

Filed 1 September 2023

STATE OF NORTH CAROLINA

v.

JEREMY JOHNSON

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, No. COA19-529-2 (N.C. Ct. App. Dec. 31, 2020) (unpublished), affirming an order entered on 14 November 2018 by Judge A. Graham Shirley in Superior Court, Wake County, denying defendant's motion to dismiss. Heard in the Supreme Court on 27 April 2023.

*Joshua H. Stein, Attorney General, by Matthew Tulchin, Special Deputy Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Kathryn L. VandenBerg, Assistant Appellate Defender, for defendant-appellant.*

*Elizabeth Simpson for Emancipate NC, amicus curiae.*

*Johanna Jennings and Emily Coward for The Decarceration Project, amicus curiae.*

PER CURIAM.

AFFIRMED.

Justices BERGER and DIETZ did not participate in the consideration or decision of this case.

Justice EARLS dissenting.

## I.    Introduction

In 1999, the General Assembly decided it was important to require the collection of traffic stop data to assess racial discrimination in the same context. Accordingly, it passed N.C.G.S. § 143B-903, which became the first law nationally to require law enforcement to record the race of every person subjected to a traffic stop. An Act to Require the Division of Criminal Statistics to Collect and Maintain Statistics on Traffic Law Enforcement, S.L. 1999-26, § 1, 1999 N.C. Sess. Laws 27 (current version at N.C.G.S. § 143B-903); Frank R. Baumgartner et al., *Suspect Citizens: What 20 Million Traffic Stops Tell Us About Policing and Race* 35 (2018) [hereinafter *Suspect Citizens*]. Supporters and opponents of the law agreed: its purpose was to determine whether police officers discriminated on the basis of race in choosing who to stop for traffic offenses.[1] *See id.* at 36–45. Thus, the required data

---

[1] Section 143B-903 was passed in response to public concern that police punished individuals for "driving while black," *Suspect Citizens*, at 36–38, and at the urging of black Senators who believed the data would "put[ ] the spotlight on something that is occurring in our state. And if it is not occurring, we simply need to say to our law officers we are glad it is not of the magnitude that we think." *Id.* at 41. Representatives opposing the law similarly perceived it as providing information on racial discrimination, arguing the law was unnecessary because "[g]ood management in the patrol ought to be able to tell who's racist." *Id.* at 45; *see also* Senate Judiciary II Committee Meeting Minutes, Feb. 25, 1999 (considering a News and Observer article titled, "Who's being stopped?," stating that black North Carolinians reported "they routinely are stopped under flimsy pretexts and their vehicles searched for drugs far more often than demographics would indicate is fair"); House Judiciary I Committee Meeting Minutes, Mar. 25, 1999 (explaining that while the law "does not accuse

collected under N.C.G.S. § 143B-903 includes, *inter alia*, "the race or ethnicity" of the driver.

In the 2001–2002 session, Senate Bill 147 broadened the mandate from the State Highway Patrol to almost all law enforcement agencies. S.B. 147, 2001 Sess. (N.C. 2001); *Suspect Citizens*, at 47. In 2009, the North Carolina General Assembly expanded the requirements of N.C.G.S. § 143B-903 by passing an Act to Amend the Law Requiring the Collection of Traffic Law Enforcement Statistics in Order to Prevent Racial Profiling and to Provide for the Care of Minor Children When Present at the Arrest of Certain Adults, S.L. 2009-544, § 1, 2009 N.C. Sess. Laws 1480 (amending an earlier version of N.C.G.S. § 143B-903 which was codified at N.C.G.S. § 114-10.01). These changes specified in part that the data collected include a unique but anonymous ID number representing the officer involved in the traffic stop. *Id.* § 1, 2009 Sess. Laws at 1481.

In this case, defendant Jeremy Johnson draws on data collected pursuant to N.C.G.S. § 143B-903 to support his claim that the officer who decided to approach him as he was sitting in his car did so at least in part because of his race. The questions before this Court are (1) what legal framework applies to selective enforcement claims, and (2) whether evidence that an officer stopped far more black drivers than white drivers allows a selective enforcement claim to proceed. Because

---

any agency of stopping people because of their race, . . . this does mean it is not occurring").

I disagree with the Court of Appeals' answers to both of these questions, I dissent from the majority's per curiam opinion affirming the Court of Appeals for lack of prejudicial error.

The United States Constitution and the North Carolina Constitution require equal protection under the law for all people. U.S. Const. amend. XIV; N.C. Const. art. I, § 19. In *Whren v. United States*, the United States Supreme Court explained that the Fourteenth Amendment's Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race." 517 U.S. 806, 813 (1996); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886) (selective enforcement of a facially neutral law against a particular race of persons violates equal protection). In *State v. Ivey*, our Court acknowledged that selective enforcement based on race, in the context of a traffic stop, violates the Equal Protection Clause. 360 N.C. 562, 564 (2006), *abrogated in part on other grounds by State v. Styles*, 362 N.C. 412 (2008). What is more, in *Ivey*, our Court made clear that it would not "tolerate discriminatory application of the law based upon a citizen's race." *Id.* at 564 (providing this statement in the context of allegations that *Ivey* involved "a case of 'driving while black'"[2]).

---

[2] "'Driving while black' refers to the charge that police stop, question, warn, cite or search African American citizens because of their race." *State v. Ivey*, 360 N.C. 562, 564 (2006) (cleaned up). Furthermore, as documented in the House Judiciary I Committee Meeting Minutes on S.B. 76, Senator Ballance noted that in North Carolina, "in some circumstances, people are being profiled." House Judiciary I Committee Meeting Minutes, Mar. 25, 1999. However, Senator Ballance went on to explain that this issue was not limited to North Carolina and that at the time, there had been two lawsuits in Maryland involving racially motivated traffic stops. *Id.* During the bill's discussion, Senator Ballance also pointed to institutional procedures that encouraged racially motivated traffic stops, noting that troopers

Accordingly, through the above referenced Act (S.L. 2009-544), N.C.G.S. § 143B-903, our federal and state constitutions, and our Court's own precedent, this Court and both our federal and state governments have been clear: selective enforcement based on race is a violation of the law. However, by affirming the Court of Appeals opinion in this case, which stated that the data collected under N.C.G.S. § 143B-903 is not sufficient to establish a racially selective enforcement claim, our Court has effectively rendered that fundamental principle meaningless. If litigants are unable to ever prove a selective enforcement claim, our federal and state Equal Protection Clauses, along with the reasoning for the collection of data required by N.C.G.S. § 143B-903, are nothing more than parchment barriers. *See United States v. Jewel*, 947 F. 2d 224, 240 (7th Cir. 1991) (Easterbrook, J., concurring) (stating that if the exclusionary rule is not applied at sentencing "the constitutional ban on unreasonable searches and seizures will become a parchment barrier"); The Federalist No. 48 (James Madison) (arguing that while laws may provide written protections, written guarantees may not always stop the majority from denying rights to minorities).

## II.    Background

Officer B.A. Kuchen of the Raleigh Police Department arrested Mr. Johnson in the early morning hours of 22 November 2017. According to his testimony, Officer

---

in New Jersey had testified to being "coached to make race-based profile stops to increase their criminal arrests." *Id.*

Kuchen was patrolling the Raleigh North Apartments in his car. As he drove through the complex's parking lot, he noticed Mr. Johnson—a black man—sitting inside of a Mustang in a marked parking spot. Officer Kuchen observed Mr. Johnson slide under the steering wheel "as much as [he] could to obscure my view of [his] person inside of that vehicle." A "no trespassing" sign was posted approximately five feet from Mr. Johnson's car. According to Officer Kuchen, he approached Mr. Johnson "[t]o address the potential of trespassing, being under a no trespassing sign, and the behavior of attempting to obscure himself from me as I drove by."

Officer Kuchen stopped his car in the road and walked toward Mr. Johnson, shining a flashlight. Mr. Johnson began to exit the car. At that point, Officer Kuchen claimed to smell marijuana. He ordered Mr. Johnson to remain in the car, but Mr. Johnson continued to exit his vehicle. Officer Kuchen commanded Mr. Johnson to stop moving and approached to handcuff him. By then, another officer had arrived to assist Officer Kuchen. Mr. Johnson pulled away from the officers and ran ten to fifteen feet before they tackled him to the ground and handcuffed him. In a search incident to arrest, officers found cocaine and marijuana.

Officer Kuchen had recently finished field training. As a new patrol officer, he recognized that his duties were to answer 911 calls and "conduct proactive criminal patrol." The Raleigh North Apartments previously had entered into an agreement with the Raleigh Police Department, requesting help in keeping trespassers off its property. Officer Kuchen was aware of this agreement.

-6-

On 5 March 2018, a Wake County grand jury indicted Mr. Johnson for possession of cocaine, possession of marijuana up to one-half ounce, and resisting a public officer. Mr. Johnson moved to suppress the evidence against him and dismiss all charges based in part on the violation of his Equal Protection rights. Mr. Johnson's claim was that Officer Kuchen approached and detained him because of his race.

At the suppression hearing, defendant called Ian Mance, who testified that he used N.C.G.S. § 143B-903 data to examine Officer Kuchen's previous traffic stops. Mance determined Officer Kuchen's ID number with high confidence by cross-referencing information from North Carolina's criminal court database, the Automated Criminal/Infractions System (ACIS), with the N.C.G.S. § 143B-903 data. The State does not argue that Mance's identification of Officer Kuchen was incorrect.

Mance found Officer Kuchen had stopped 299 drivers, 245 of whom were black (about 82%). Subsection 143B-903(a)(15) requires officers to record the geographic location of each traffic stop only by the "city or county in which the stop was made," not by a specific location within a city, so Mance could not have determined where any of these stops occurred. Out of all Raleigh Police Department traffic stops since 2002 (nearly one million stops), 46% were of black drivers. That number, Mance noted, outpaced Raleigh's population of black citizens. According to the 2016 U.S. Census Data, just 28% of Raleigh residents were black. Mark Taylor, an intern at the Wake County Public Defender's Office, also testified. He explained how he searched the ACIS and discovered that, of the 204 cases listing Officer Kuchen as the

complainant, 166 of the people charged were black—a staggering 81.4%.

As Officer Kuchen recounted at trial, he started his field training in May 2017 and split his time between the Raleigh Police Department's southeast and northwest districts. When he rode with a supervisor during his training, Officer Kuchen, explained, he initiated most of the stops. After completing his training, Officer Kuchen began patrolling on his own in October 2017. Although he was assigned to the southeast district, he did not have a specific beat, choosing instead to "float around" the entire district.

After the evidentiary hearing, Judge A. Graham Shirley denied Mr. Johnson's motions. On appeal, the Court of Appeals applied a three-part, burden-shifting framework common to equal protection claims. It concluded that Mr. Johnson had not met his initial burden to show prima facie discrimination because the statistics did not include

> appropriate benchmarks from which we can determine discriminatory effect or purpose. Without knowing the demographics of southeast Raleigh—the district Officer Kuchen was assigned and where this stop occurred—there is no adequate population benchmark from which we can assess the racial composition of individuals and motorists "faced by" Officer Kuchen.

*State v. Johnson*, No. COA19-529-2, 2020 WL 7974001, at *8 (N.C. Ct. App. Dec. 31, 2020) (unpublished). Therefore, the Court of Appeals affirmed the trial court's denial of Mr. Johnson's motion to suppress. *Id.* at *9.

## III.  Standard of Review

Constitutional errors are reviewed de novo. *State v. Johnson,* 379 N.C. 629, 634 (2021). When examining a trial court's factual findings, this Court asks whether they are supported by competent evidence. *State v. Cooke*, 306 N.C. 132, 134 (1982).

## IV. Legal Framework for Selective Enforcement

The U.S. Constitution "prohibits selective enforcement of the law based on considerations such as race." *Whren*, 517 U.S. at 813 (declaring that a Fourth Amendment challenge of a traffic stop as racially motivated should have been brought under the Equal Protection Clause); *Ivey*, 360 N.C. at 564 (citing *Whren* to conclude that "this Court will not tolerate discriminatory application of the law based upon a citizen's race"). This Court has never addressed whether the North Carolina Constitution contains a similar right, but here the majority affirms the Court of Appeals decision finding such a right, and I agree. *See* N.C. Const. art. I, § 19 ("No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.").

To address selective enforcement claims some federal courts apply *United States v. Armstrong,* 517 U.S. 456 (1996), which created an intentionally strenuous discovery standard for selective *prosecution* (not enforcement) claims. *See, e.g., Johnson v. Holmes*, 782 F. App'x 269, 276 (4th Cir. 2019) (applying *Armstrong* to a selective enforcement claim); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1263–65 (10th Cir. 2006) (same); *see also Armstrong*, 517 U.S. at 464 ("[T]he showing

necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims.").  To earn discovery, *Armstrong* requires a defendant to provide evidence of similarly situated people of other races who the State could have prosecuted but did not.  *Id.* at 465–66. The ultimate, post-discovery conclusion relies on "ordinary equal protection standards": the evidence must show a "discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 465 (cleaned up).

Other courts adopt *Armstrong*'s approach of requiring a pre-discovery showing of discrimination but find that *Armstrong*'s similarly situated requirement sets too high a bar for selective enforcement claims. *See, e.g., United States v. Sellers*, 906 F.3d 848, 855–56 (9th Cir. 2018); *see generally* Alison Siegler and William Admussen*, Discovering Racial Discrimination by the Police,* 115 Nw. U. L. Rev. 987 (2021) (arguing that *Armstrong* sets too high a bar for discovery). These courts

> have suggested that the presumptions of regularity and immunity that usually attach to official prosecutorial decisions do not apply equally in the less formal setting of police arrests. They've reasoned, too, that comparative data about similarly situated individuals may be less readily available for arrests than for prosecutorial decisions, and that other kinds of evidence . . . may be equally if not more probative in the [enforcement] context.

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1733–34 (2019) (Gorsuch, J., concurring in part and dissenting in part) (concluding that the relevance of *Armstrong* to selective enforcement remains an open question). Courts that purportedly do not ease *Armstrong*'s requirements may nevertheless use a lenient understanding of the similarly situated requirement where, as in the present case, a defendant attempts

to meet their burden using statistical evidence that a police officer stopped a disproportionately high number of black drivers. *See Johnson*, 782 F. App'x at 282. This is likely because a strict understanding of the similarly situated requirement would effectively bar selective enforcement claims in these cases, given the State "does not (and could not) record the races of specific drivers who could have been stopped but were not." *See id.* But a more lenient understanding of the similarly situated requirement makes it redundant: evidence showing discrimination also supports an inference of similarly situated individuals who were treated differently. *See id.* ("[T]he percentage of white drivers stopped and ticketed by the other officers patrolling the same locations as [the officer who pulled over the defendant] serves as a proxy to show the general racial composition of drivers on the road that [the officer who pulled over the defendant] could have pulled over but did not."). This weighs in favor of abandoning the similarly situated requirement entirely.

Still other courts use the burden-shifting framework employed in other Equal Protection contexts, such as jury selection. *E.g.*, *Commonwealth v. Long*, 485 Mass. 711, 713 (2020) (shifting the burden to the government after defendant makes a prima facie showing of selective enforcement); *United States v. Hare*, 308 F. Supp. 2d 955, 992 (D. Neb. 2004) (same); *see also Batson v. Kentucky*, 476 U.S. 79, 97 (1986) (using a burden-shifting framework for racial discrimination in jury selection). Instead of allowing discovery for a defendant to substantiate their claim, this approach burdens the State with producing evidence to counter the reasonable

inference. To challenge a peremptory juror strike, the defendant must first "make a prima facie showing" that the State discriminated on the basis of race. *State v. Taylor*, 362 N.C. 514, 527 (2008). "If the defendant makes the requisite showing, the burden shifts to the state to offer a facially valid, race-neutral explanation . . . ." *Id.* "Finally, the trial court must decide whether the defendant has proved purposeful discrimination." *Id.* This final step requires the court to find both a discriminatory effect and a discriminatory intent.[3] *See id.*

Given how contested this area of law is, the majority's decision to affirm per curiam the Court of Appeals' adoption of the burden-shifting framework while simultaneously making it impossible to establish a prima facie case is an abdication of our responsibility to decide cases pending before us. While there are advantages to using the burden-shifting approach, there are also advantages to using the approach from *Armstrong*. Accordingly, an opinion that clarifies the correct standard for

---

[3] It is important to remember that discrimination may occur through implicit bias, *i.e.*, subconscious racial prejudice or stereotyping. *See, e.g., Batson v. Kentucky*, 476 U.S. 79, 106 (1986) (Marshall, J., concurring) ("A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically."); *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 540 (2015) (describing "unconscious prejudices" as a type of "discriminatory intent"); *Woods v. City of Greensboro*, 855 F.3d 639, 652 (4th Cir. 2017) (holding that bias, if "implicit, is no less intentional" in the context of a statutory racial discrimination claim); *Samaha v. Wash. State Dep't of Transp.*, No. CV-10-175-RMP, 2012 WL 11091843, at *4 (E.D. Wash. 2012) ("Testimony that educates a jury on the concepts of implicit bias and stereotypes is relevant to the issue of whether an employer intentionally discriminated against an employee.").

selective enforcement cases in North Carolina is warranted.[4]

The differences between enforcement and prosecution make a compelling case for lowering *Armstrong*'s pre-discovery standard in the context of selective enforcement. What that lower barrier should be is an open question. This Court could follow the Ninth Circuit's example and abandon the requirement that a defendant show that similarly situated individuals of a different race were treated differently. *See Sellers*, 906 F.3d at 855–56. Similarly, the Third Circuit requires only evidence of a discriminatory effect, not evidence of a discriminatory intent or similarly situated individuals. *United States v. Washington*, 869 F.3d 193, 221 (3d Cir. 2017). The Seventh Circuit allows "limited [discovery] that can be conducted in a few weeks," which can be expanded "only if evidence discovered in the initial phase justifies a wider discovery program." *United States v. Davis*, 793 F.3d 712, 723 (7th Cir. 2015). This Court could even adopt its own standard, such as by importing the prima facie standard from the jury selection caselaw. *See, e.g., Batson*, 476 U.S. at 97 (requiring prima facie evidence to satisfy the initial burden under the burden-shifting framework).

By failing to engage the above questions, the majority left open the possibility that the Court of Appeals applied the wrong framework. In doing so, the Court

---

[4] The trial court's order analyzed Mr. Johnson's Equal Protection claim under the selective prosecution approach requiring proof of a similarly situated individual of a different race being treated differently, applying *Chavez v. Ill. State Police,* 251 F.3d 612 (7th Cir. 2001) and *Hubbard v. Holmes,* 2018 U.S. Dist. Lexis 67278 (W.D. Va. 2018).

abdicated the responsibility it took on when deciding to hear the case: to clarify "legal principles of major significance to the jurisprudence of the State." *See* N.C.G.S. § 7A-31(c)(2) (2021). I dissent because I would clarify the correct framework.

## V.    Prima Facie Standard of Proof

If the Court of Appeals was correct to apply the burden-shifting framework, I would hold that it erred by finding Mr. Johnson's statistical evidence failed to make a prima facie showing of discriminatory effect and intent.

Generally, "[a] 'prima facie case' . . . means no more than evidence sufficient to justify, but not to compel an inference." *Staples v. Carter*, 5 N.C. App. 264, 267 (1969) (quoting *Vance v. Guy*, 224 N.C. 607, 609 (1944)); *see also id.* at 266 (stating that prima facie evidence can be submitted to a jury, "nothing else appearing"); *DeArmon v. B. Mears Corp.*, 312 N.C. 749, 756 (1985) (describing prima facie evidence as permitting but not compelling a conclusion, "nothing else appearing"); *Commonwealth v. Pauley*, 368 Mass. 286, 291–92 (1975) ("The words 'prima facie' mean practically this: That on that evidence alone, nothing else appearing, . . . [the law] permitted, but did not oblige . . . , [a finding]."). "The Supreme Court has explicitly rejected the use of a 'more likely than not' standard in determining whether a prima facie case of discrimination has been established . . . ." *State v. Bennett*, 374 N.C. 579, 598 (2020) (quoting *Johnson v. California*, 545 U.S. 162, 168 (2005)). Therefore, in the context of Equal Protection, evidence establishes prima facie discrimination where "the totality of the relevant facts gives rise to an inference" of

discrimination. *See id.* (quoting *Johnson*, 545 U.S. at 168) (stating the quoted rule in the context of discriminatory jury selection); *Long*, 485 Mass. at 717 (stating that prima facie evidence "raises at least a reasonable inference of impermissible discrimination" in the context of selective enforcement).

"[S]tatistical proof normally must present a 'stark' pattern to be accepted as the sole proof of discriminatory intent under the Constitution." *McCleskey v. Kemp*, 481 U.S. 279, 293 (1987). However, statistics cannot be held to such a high standard that defendants cannot ever successfully claim selective enforcement. *Long*, 485 Mass. at 721 (lowering the initial burden to show selective enforcement because "[t]he right of drivers to be free from racial profiling will remain illusory unless and until it is supported by a workable remedy"); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 147 (1803) ("[E]very right, when withheld, must have a remedy . . . ."). Accordingly, when statistics permit an inference of discrimination but could be strengthened or weakened by information that only the State can provide, the burden shifts to the State to explain the statistics. *See United States v. Crowthers*, 456 F.2d 1074, 1078 (4th Cir. 1972) ("We think defendants made a sufficient prima facie showing . . . and that the government, being in possession of the facts . . . , should have come forward with evidence . . . .").

Here, Mr. Johnson's statistical evidence constituted a prima facie showing of racial discrimination by Officer Kuchen. Mr. Johnson offered two benchmarks: (1) that 28% of Raleigh's population was black, and (2) that 46% of the Raleigh Police

Department's traffic stops involved black drivers. As the Court of Appeals noted, these numbers are "stark[ly]" different from Officer Kuchen's traffic stops, 82% of which involved black drivers. *Johnson*, 2020 WL 7974001, at *8. Therefore, "nothing else appearing," these statistics "permit" but do "not compel[ ]" an "inference" that Officer Kuchen discriminated on the basis of race in conducting his police duties, including when he approached Mr. Johnson. *See Staples*, 5 N.C. App. at 266–67 (quoting *Vance*, 224 N.C. at 609); *Bennett*, 374 N.C. at 598. They are a textbook example of prima facie evidence.

Moreover, the use of statistics alone to show racial discrimination is not novel and has been used in other contexts. In fact, "[i]n the problem of racial discrimination, statistics often tell much, and Courts listen." *Alabama v. United States*, 304 F.2d 583 (5th Cir.), *aff'd per curiam*, 371 U.S. 37 (1962). One such example is the case of *Hawkins v. Town of Shaw*, where the court used statistics to find black citizens in Shaw, Mississippi, were being disproportionately deprived of municipal services such as paved streets, sewers, streetlights, surface water drainage, water mains, fire hydrants, and traffic control because of their race. 437 F.2d 1286, 1288–89 (5th Cir. 1971)[5]; *see also Alabama*, 304 F.2d 583 (providing statistics showing that although the population of Macon County, Alabama, was 83% black, less than 10% of those meeting the required voting age were registered to vote, and this stood in contrast to

---

[5] This decision was also affirmed on rehearing in *Hawkins v. Town of Shaw*, 461 F.2d 1171 (5th Cir. 1972).

whites of the required voting age that were registered to vote at nearly 100% despite being only 17% of the county's total population); *U.S. ex rel. Seals v. Wiman*, 304 F.2d 53, 67 (5th Cir. 1962) (using U.S. Supreme Court precedent to determine that "the presence of no [African-Americans] on the 18-man grand jury which indicted [the defendant], and the 2 [African-Americans] on the venire of the 110 persons from which came the petit jury which convicted [the defendant] and condemned him to death was not a mere fortuitous accident but was the result of systematic exclusion of [African-Americans] from the jury rolls"); *United States v. Edwards*, 333 F.2d 575, 581 n.3 (5th Cir. 1964) (Brown, J., dissenting) (noting that while African Americans made up 37.3% of the population they only constituted 1% of registered voters); *Bing v. Roadway Exp., Inc.*, 485 F.2d 441 (5th Cir. 1973) (noting that among the almost 300 road drivers hired by the company, not one was African-American); *United States v. Ironworkers Loc. 86*, 443 F.2d 544 (9th Cir. 1971) (noting that of the 3,720 union members, only three were black).

Statistics on the racial composition of the districts Officer Kuchen patrolled might have been additionally useful here.[6] But Mr. Johnson did not need to produce such information to meet his initial burden, for two reasons.

First, it is not clear that such statistics would provide better benchmarks.

---

[6] The Court of Appeals faulted Mr. Johnson for failing to produce demographic statistics for the southeast district, but Officer Kuchen's traffic stops also occurred in the northwest district.

Were they to show that one district contained a high percentage of black residents and one district contained a low percentage, the court would then need information on which district each of Officer Kuchen's stops occurred in. Because the publicly available data does not contain this information, *see* N.C.G.S. § 143B-903(a)(15) (2021), the burden must shift to the State to provide it. Additionally, the percentage of black residents in Officer Kuchen's districts might be a poor proxy for the percentage of black drivers on the roads. White people are overrepresented among drivers because "having a driver's license, owning a car, and driving regularly are all more common among white Americans than black Americans." *Suspect Citizens*, at 65; *see generally* Mike Dolan Fliss, *Observations on the Measurement of North Carolina Traffic Stop Disparities* (2022). And while the ratio of nonresident drivers to residents may be low for large geographies like a city or county, the police districts in question covered only small portions of Raleigh.[7] *See Raleigh Police Districts*, City of Raleigh (last updated Aug. 21, 2023), https://raleighnc.gov/safety/raleigh-police-districts.

Second, it is not clear that demographic statistics for the districts Officer Kuchen patrolled can be produced; requiring them could therefore deprive selective enforcement victims of a remedy. At oral argument, the parties alluded to the possibility that such statistics could come from census data. But the U.S. Census

---

[7] The record does not contain sufficient evidence for a court to determine whether Officer Kuchen's districts contained major thoroughfares.

Bureau does not provide demographic statistics tailored to Raleigh police districts, and the State introduced no evidence on whether such statistics could be constructed out of available census data.[8]

The Court of Appeals failed to consider another benchmark statistic that almost certainly can be produced and might be even more useful than district demographics: the racial breakdown of traffic stops made by other officers who patrolled the same districts as Officer Kuchen. This statistic was demonstrably *not* available to Mr. Johnson because the publicly available traffic stop data does not include location information below the city level. *See* N.C.G.S. § 143B-903(a)(15). But this statistic was almost certainly available to the State, given it knows which officers are assigned to which districts and records their traffic stop data pursuant to N.C.G.S. § 143B-903. Indeed, N.C.G.S. § 143B-903(d) expressly contemplates the possibility that traffic data may need to be deanonymized "to resolve a claim or defense properly before the court." The burden to provide this benchmark therefore

---

[8] If it is possible to construct demographic statistics for police districts using census data, the State would be better suited to the task, as it likely knows the exact boundaries of each district. The district boundaries appear to be publicly available only as shaded areas on a map. *See Raleigh Police Districts*, City of Raleigh (last updated Aug. 21, 2023) https://raleighnc.gov/safety/raleigh-police-districts. Requiring census-provided population statistics of the area a police officer patrols could also run into issues with the Census Bureau's decision to implement differential privacy on its data products starting in 2020. Differential privacy will lower the accuracy of census and American Community Survey products in the interest of preventing household-level data from being deduced from summary statistics. *See Alabama v. U.S. Dep't of Com.,* 546 F. Supp. 3d 1057, 1064–65 (M.D. Ala. 2021). The accuracy-reduction may be particularly pronounced for minority communities in small geographic areas. Christopher T. Kenny et al., *The Impact of the U.S. Census Disclosure Avoidance System on Redistricting and Voting Rights Analysis* 21 (2021).

falls on the State, or else defendants like Mr. Johnson would be left without a remedy for selective enforcement. "It is neither novel nor unfair to require the party in possession of the facts to disclose them." *Crowthers*, 456 F.2d at 1078.

By pushing the burden to produce granular benchmark statistics onto defendants, the Court of Appeals did not only err; it also created an incentive for the State to avoid making such data publicly available. "The law should not create or allow such an incentive," *see Johnson*, 782 F. App'x at 281, especially in this context, where the General Assembly has indicated a preference for the public to be able to access police data to assess racial discrimination, *see* N.C.G.S. § 143B-903; *Suspect Citizens*, at 36–45.

The Court of Appeals decision allows the State to avoid selective enforcement claims by withholding relevant data. However, Mr. Johnson's only burden at this stage was to make a prima facie showing of racial discrimination. This is not a high bar to meet, and all that was required was for Mr. Johnson to show that "the totality of the relevant facts gives rise to an inference" of discrimination. *See Bennett*, 374 N.C. at 598 (quoting *Johnson*, 545 U.S. at 168). Mr. Johnson presented a prima facie case of racial discrimination by presenting data (1) that 28% of Raleigh's population was black; (2) that 46% of the Raleigh Police Department's traffic stops involved black drivers; (3) that of the 299 drivers Officer Kuchen had stopped, 245 (about 82%) were black; and (4) that of the 204 cases with Officer Kuchen as the complainant, 166 of the people charged (81.4%) were black. To be clear, a prima facie case is only the first

step of this analysis. Officer Kuchen could offer legitimate nondiscriminatory reasons for the actions he took, beyond that he was investigating a trespass, that would lead the fact-finder to conclude that race was not a factor in his decision to investigate Mr. Johnson. But by denying the legitimate force of the statistical evidence here and placing an impossible high hurdle that can never be met, the Court of Appeals opinion prevents any further inquiry whatsoever.

## VI. Conclusion

Discrimination based on race by state actors violates our federal and state constitutions, U.S. Const. amend. XIV; N.C. Const. art I, § 19, and contravenes the intent of the General Assembly in passing N.C.G.S. § 143B-903. *See* Senate Judiciary II Committee Meeting Minutes, Feb. 25, 1999 (considering a news article detailing the disparate traffic stops of black North Carolinians); House Judiciary I Committee Meeting Minutes, Mar. 25, 1999 (while the Act "does not accuse any agency of stopping people because of their race . . . this does not mean it is not occurring"). The statistically disproportionate stopping of black North Carolina drivers suggests that how likely a person is to be stopped while driving is more closely related to the race of the driver than the commission of a traffic offense. Accordingly, when a police officer disproportionately stops or searches black drivers, he or she not only violates the law but also delegitimizes the legal system. *See* Juliana Menasce Horowitz et al., Race in America 2019, at 34, 41 (2019) (finding that 84% of black Americans agreed that blacks are treated less fairly than whites in dealing with the police and 44% of

black Americans reported being unfairly stopped by the police). This remains true regardless of whether those discriminatory stops reveal criminality.

A prima facie showing of discrimination does not condemn Officer Kuchen's actions here, and it does not conclusively establish that his interaction with Mr. Johnson was based on race. Instead, a prima facie showing is the first step in a burden-shifting equal protection analysis and at subsequent steps Officer Kuchen can still demonstrate that race did not play a role in his stopping of Mr. Johnson. Therefore, assuming that the Court of Appeals was correct to apply the burden-shifting framework, I would hold that Mr. Johnson successfully made a prima facie showing that Officer Kuchen violated his Equal Protection rights by selectively enforcing the law against him because of his race. *See Ivey*, 360 N.C. at 564 (determining that the Equal Protection Clause of the United States Constitution "prohibits selective enforcement of the law based on considerations such as race" (cleaned up)); *Yick Wo*, 118 U.S. at 373 (deciding a case involving the disparate application of the law to Chinese immigrants "with a mind so unequal and oppressive as to amount to a practical denial by the state of . . . equal protection of the laws"). I would also clarify the correct legal standard for selective enforcement claims brought under the North Carolina Constitution and remand Mr. Johnson's case for further evidentiary hearings tailored to that standard.

By affirming the Court of Appeals opinion, the majority turns a blind eye to the documented historical racial disparities in traffic stops by Officer Kuchen, which

may or may not ultimately be justified on non-racial grounds, and potentially renders the Equal Protection Clauses of both the United States Constitution and North Carolina Constitution illusory for Mr. Johnson. Moreover, left in place is a precedent that appears to make it legally and factually impossible to establish any prima facie case of racial discrimination because the data such a case requires does not exist.

I respectfully dissent.

Justice MORGAN joins in this dissenting opinion.